Edgar M. HENDRICKS, Petitioner–Appellant,

v.

Daniel VASQUEZ, Warden, and the Attorney General of the State of California, Respondents–Appellees.

No. 91–16631.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 9, 1992.

Decided Sept. 2, 1992.

As Amended on Denial of Rehearing Oct. 29, 1992.

William Goodman, Topel & Goodman, San Francisco, Cal., for petitioner-appellant.

Dane R. Gillette, Deputy Atty. Gen., San Francisco, Cal., for respondents-appellees.

Before GOODWIN, CANBY and RYMER, Circuit Judges.

GOODWIN, Circuit Judge:

In petitioning this court for a writ of habeas corpus, Edgar M. Hendricks alleges numerous constitutional errors with respect to his conviction for murder, sentence of death, and habeas corpus appeal. All but one of Hendricks' claims are unavailing. Because we find that the district court erred in failing to conduct an evidentiary hearing with respect to Hendricks' ineffective assistance of counsel claim, we remand this case for a hearing on that claim.

Hendricks committed the San Francisco murders which are the subject of this petition in late 1980. In September of that year, Hendricks agreed to have sex with Joseph Nelson in return for a fee. Hendricks accompanied Nelson to the latter's apartment where they had sex. Hendricks also had sex with James Parmer, Nelson's roommate. A few days later, Hendricks returned to the apartment, broke in, and shot Parmer six times at point blank range. He took Parmer's checkbook and fled. Shortly thereafter, Hendricks had a paid sexual encounter with Charleston Haynes in the latter's apartment. After the encounter, Hendricks shot Haynes five times at point blank range, took Haynes' checkbook, and fled.

Although this appeal concerns only the Parmer and Haynes murders, three other uncharged murders Hendricks committed became relevant at trial. The first of the three other victims, Harry Carter, was a 79–year–old homosexual with whom Hendricks lived for about two weeks in the former's Los Angeles apartment. After Carter called Hendricks a "low life," Hendricks stabbed and killed Carter. The second victim, Virginia Hernandez, was a prospective client of Hendricks' whom Hendricks shot and killed after she began criticizing Hendricks for his lifestyle. The final victim, James Burchell, was a sexual client of Hendricks' who lived in Los Angeles.

In 1981, Hendricks was convicted of murder and sentenced to death in San Francisco for the Parmer and Haynes murders. Hendricks appealed his conviction and sentence to the California Supreme Court. That court rejected his appeal in *People v. Hendricks*, 44 Cal.3d 635, 244 Cal.Rptr. 181, 749 P.2d 836 (1988). Hendricks followed his direct appeal with a state habeas corpus petition which the California Supreme Court also rejected.

Hendricks subsequently petitioned the federal district court for a writ of habeas corpus. Two days after Hendricks filed his 69–page petition, the district court summarily dismissed the petition. In *Hendricks v. Vasquez*, 908 F.2d 490 (9th Cir.1990), we reversed the summary dismissal and remanded the case for further consideration. On remand, the district court again denied Hendricks' petition. *Hendricks v. Vasquez*, No. C–89–2901–JPV (N.D.Cal.1991). In rejecting Hendricks' claims, the court declined to hold any evidentiary hearings. Hendricks timely appealed to this court.

## I. *The District Court's Failure to Hold Evidentiary Hearings*

In considering Hendricks' habeas petition, the district court held no evidentiary hearings. Hendricks had requested a hearing for most of his claims and now alleges that it was error for the court to refuse to hold any hearings.

■ A habeas petitioner is entitled to an evidentiary hearing on a claim if "(1) the petitioner's allegations, if proved, would entitle him to relief, and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts." *Creech v. Arave*, 947 F.2d 873, 887 (9th Cir.1991), *cert granted* — U.S. —, 112 S.Ct. 2963, 119 L.Ed.2d 585 (1992). The corollary to this is that no hearing is required if either the state court has reliably found the relevant facts, *Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir.1990), or there are no disputed facts and the claim presents a purely legal question. *Harris v. Pulley*, 885 F.2d 1354, 1378 (9th Cir.1988).

With the exception of Hendricks' ineffective assistance claim, the district court did not err in failing to hold evidentiary hearings. Other than that exception, all of Hendricks' claims involve purely legal disputes, or they concern facts which the state trial court has reliably found.

## II. *Excusal of Jurors for Cause*

Hendricks argues that in excusing four prospective jurors the trial judge violated his right to an impartial jury under the sixth and fourteenth amendments. Specifically, Hendricks claims that it was error for the trial judge to excuse the prospective jurors for their views on capital punishment because the jurors did not clearly state their opposition to that penalty.

■ A prospective juror may not be excused for her views concerning capital punishment unless those views would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and oath. *Wainwright v. Witt*, 469 U.S. 412, 420, 105 S.Ct. 844, 850, 83 L.Ed.2d 841 (1985). A finding by the trial judge of juror bias concerning the death penalty is a factual finding entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *Id.* at 429, 105 S.Ct. at 854. The question in this case "is not whether a reviewing court might disagree with the trial court's findings, but whether these findings are fairly supported by the record." *Id.* at 434, 105 S.Ct. at 857.

■ During voir dire, the trial judge excused certain potential jurors because, based on their responses to questions, he concluded that their opposition to the death penalty would prevent them from properly performing their duties as jurors. To each of these four prospective jurors, the prosecutor repeatedly posed the ultimate question: "Would you automatically vote against the death penalty regardless of the evidence?" Each of the four answered unequivocally in the affirmative. The record supports the trial judge's decision.

## III. *Hendricks' Confessions*

Hendricks claims that San Francisco police investigators obtained two statements from him in violation of the fifth and sixth amendments. Accordingly, Hendricks argues, it was error for the trial judge to admit these statements into evidence.

On March 23, 1981, FBI agents arrested Hendricks in Dallas on a charge of unlawful flight from homicide charges in California and arraigned him on that charge. Four days later, San Francisco police detectives arrived in Dallas, seeking to question Hendricks about the homicide charges. The detectives read Hendricks the *Mi-*

*randa* warnings and Hendricks invoked his right to remain silent. The next day, March 28, the detectives brought Hendricks to San Francisco. Several times during the trip from Dallas to San Francisco, Hendricks attempted to initiate conversation about the homicides with the detectives but they told him to wait.

In the San Francisco interview room, the detectives asked Hendricks whether he had remembered the *Miranda* warnings from the day before. Hendricks responded that he did, and then made a first statement confessing to the Parmer and Haynes murders. Hendricks testified at the suppression hearing that he made the statement because he had wanted the police to know what had happened.

After making his first statement, Hendricks rode in a car with the detectives to the scenes of the two San Francisco homicides. In the car, Hendricks told the detectives that he knew about three other homicides which had taken place in Los Angeles and Oakland but would talk about them only if the detectives provided him with a fifth of whiskey and a Bible. After obtaining the requested items, the detectives returned Hendricks to the interrogation facility. Once there, the detectives read Hendricks the *Miranda* warnings and Hendricks made his second statement—a confession to the Carter, Burchell, and Hernandez murders—while drinking some of the whiskey.

At the suppression hearing concerning Hendricks' first statement, the trial judge found that the *Miranda* warnings given by the San Francisco police on March 27 were proper, that Hendricks had initiated the conversations with the detectives on the trip to San Francisco, and that Hendricks' statement was free and voluntary.

At the trial from which this appeal arises, Hendricks did not move to suppress his second statement. However, at the subsequent trial in Los Angeles for the murders covered by the second statement, Hendricks did move to suppress it. At that hearing, Hendricks conceded that the alcohol had not affected his ability to understand and give answers to the detectives'

questions. The Los Angeles trial judge found that "[Hendricks] was properly Mirandized and it was a free and voluntary statement. It appears from hearing the tapes [of the confession] that there was no effect of the alcohol and he was really anxious to make all the statements to them."

 Hendricks' sixth amendment argument concerning the two statements is unavailing. The sixth amendment right to counsel attaches after a defendant has been arraigned. *Michigan v. Jackson*, 475 U.S. 625, 629, 106 S.Ct. 1404, 1407, 89 L.Ed.2d 631 (1986). However, the sixth amendment is offense-specific. *McNeil v. Wisconsin*, —— U.S. ——, ——, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991). In other words, if a defendant is arraigned on one charge, then the sixth amendment right to counsel attaches to that charge but not to a different charge for which the defendant has not yet been arraigned. We have recognized a limited exception to that rule, however, when the two charges are "so inextricably intertwined ... that the right to counsel for the pending charge cannot constitutionally be isolated from the right to counsel for the uncharged offense." *United States v. Hines*, 963 F.2d 255, 257 (9th Cir.1992). In addition, where state and federal authorities act in collusion to circumvent a defendant's right to counsel, the sixth amendment right may extend from a state charge to a federal one when the two charges arise "from the same incident." *United States v. Martinez*, 972 F.2d 1100, 1101, 1102, 1105 (9th Cir.1992) (state and federal charges identical: felon in possession of firearm).

 Hendricks fits into neither the *Hines* dictum nor the *Martinez* exception. Hendricks was arraigned in Dallas on a charge of interstate flight to avoid prosecution (for murder), but was interrogated by San Francisco police on a charge of murder. Although not wholly unrelated, the two crimes have totally independent elements. The murders were separate incidents from the flight; they were neither "inextricably intertwined" with the flight charge nor did they arise from the same

conduct. As uncharged and distinct "additional crimes," they were not subject to the sixth amendment right to counsel that attached when Hendricks was arraigned on his flight charge. *McNeil,* — U.S. at —— – ——, 111 S.Ct. at 2207–08 (quoting *Maine v. Moulton,* 474 U.S. 159, 179–180, 106 S.Ct. 477, 488–89, 88 L.Ed.2d 481 (1985)).

 Hendricks' fifth amendment challenge to the admission of his two statements is similarly unavailing. Hendricks' first statement was a product of proper *Miranda* procedure and not of coercion. Once a suspect who is in custody and is being interrogated asserts his right to remain silent, the interrogation must cease. *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). However, the interrogators may recommence questioning if the suspect initiates the conversation. *Cf Oregon v. Bradshaw,* 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983). Initiation of conversation by the suspect after the suspect has been apprised of his *Miranda* rights and has invoked the right to remain silent, can be construed as a waiver of the *Miranda* rights. *U.S. v. Montana,* 958 F.2d 516, 519 (2nd Cir.1992).

 In this case, the San Francisco detectives properly *Mirandized* Hendricks on the 27th and Hendricks invoked his right to remain silent. The next day, Hendricks initiated the conversation with the detectives. In doing so, Hendricks waived his *Miranda* rights. *See Montana,* 958 F.2d at 519. Moreover, the record shows that Hendricks made his first statement freely and voluntarily. Accordingly, Hendricks' fifth amendment argument concerning his first statement is without merit.

Concerning Hendricks' second statement, the detectives correctly followed all proper interrogation procedures. Hendricks' only claim of error concerning this statement is that he was drunk when he made the statement. This claim is contradicted by the findings of the trial judge in the Los Angeles case. Those findings are well supported by the record. Accordingly, Hen-

dricks' fifth amendment claim concerning his second statement is without merit.

IV. *Admission of Other Crimes Evidence*

Hendricks argues that the trial judge erred in allowing the prosecution to introduce evidence of Hendricks' Los Angeles murders during both the guilt and the penalty phase.

With respect to the guilt phase, Hendricks claims that the admission of evidence concerning the Los Angeles murders deprived him of his right under the sixth and fourteenth amendments to a fair opportunity to present a defense. Specifically, Hendricks' only defense during the guilt phase was that he could not have formed the required mental state to commit first degree murder. To present this defense, counsel for Hendricks planned to call psychologist Dr. Carson to the stand who was to testify that Hendricks had committed the San Francisco murders in a "homosexual rage." Faced with the prospect of Dr. Carson's testimony, the prosecution proposed to cross-examine Dr. Carson concerning the Los Angeles murders for which Hendricks had not yet been charged. The trial judge denied a motion in limine by the defense to bar the proposed cross-examination. In light of the trial judge's ruling, counsel for Hendricks elected not to call Dr. Carson to the stand. In fact, counsel rested Hendricks' guilt phase defense without calling any witnesses because Dr. Carson was his only proposed defense witness.

 Hendricks cannot argue that the trial judge erred under California evidentiary law in ruling admissible evidence of the Los Angeles homicides. Federal habeas will not lie for errors of state law. *Estelle v. McGuire,* — U.S. ——, ——, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991). Instead, Hendricks argues that the trial judge's ruling deprived him of his rights to obtain witnesses and to a fair opportunity to present a defense. Hendricks' argument fails because the trial judge did neither. Hendricks' own counsel decided not to call Dr. Carson. Accordingly, Hen-

dricks' complaint is with his own counsel, not the trial judge.

At the penalty phase, counsel for Hendricks decided to call Dr. Carson to testify. During cross-examination, the government introduced evidence of the Los Angeles murders. Hendricks argues that this admission of evidence was in error because the Los Angeles murders were not sufficiently proven. In support of this argument, Hendricks relies on his earlier claim that his confession to the Los Angeles murders was obtained in violation of his constitutional rights. Because this earlier claim was without merit, Hendricks' argument concerning the penalty phase introduction of other crimes evidence is also unavailing.

## V. *Sufficiency of Special Circumstances Evidence*

Hendricks argues that the evidence from trial was insufficient to establish the special circumstances alleged in his case. At trial, the jury had found that three special circumstances existed: (1) felony murder for the Parmer robbery; (2) felony murder for the Parmer burglary; and (3) multiple murder. Hendricks argues that the prosecution presented insufficient evidence concerning his mental state to establish the robberies and the burglary, as well as the multiple murder. Because of this, Hendricks claims, his conviction was obtained in violation of his right to due process under the fourteenth amendment.

The evidence supporting the special circumstance findings is sufficient if " 'viewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Lewis v. Jeffers*, 497 U.S. 764, ——, 110 S.Ct. 3092, 3103–04, 111 L.Ed.2d 606 (1990) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

 With regard to the multiple murder special circumstance finding, the jury found Hendricks guilty of murdering Haynes and of murdering Parmer. Those findings included findings concerning the requisite mental state for murder. Hen-

dricks does not challenge the sufficiency of the evidence for each individual murder. Moreover, Hendricks does not argue that the multiple murder special circumstance requires a finding of some mental state independent of the mental state required for each murder. Accordingly, Hendricks' sufficiency of evidence argument concerning the multiple murder special circumstance is without merit.

 With regard to the felony-murder-robbery special circumstances, ample evidence supported those findings. As the California Supreme Court observed:

> Defendant's paramour, Annette Stone, under a grant of immunity, testified that prior to the Parmer murder defendant left their motel room announcing "[h]e was going to find a faggot, knock him over the head, and take his money." He later returned with Parmer's checkbook; Stone cashed a check for $255 by forging the victim's signature, turning the proceeds over to defendant.

*Hendricks*, 44 Cal.3d at 644, 244 Cal.Rptr. 181, 749 P.2d 836.

## VI. *Failure to Instruct Jury on Defense Theories*

Hendricks argues that the trial judge erred in refusing to give four requested jury instructions. These refusals, Hendricks claims, rendered his trial fundamentally unfair in violation of his right to due process under the fourteenth amendment.

 A faulty jury instruction will constitute a violation of due process only where the instruction by itself infects the entire trial to such an extent that the resulting conviction violates due process. *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). Where the alleged error is the failure to give an instruction the burden on the petitioner is "especially heavy." *Henderson v. Kibbe*, 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977).

 Hendricks' first assertion of jury instruction error concerns a requested claim of right instruction. Three of the four special circumstances alleged in Hen-

dricks' case involved felony murders. Each of the alleged felonies involved some form of theft. At trial, Hendricks requested an instruction informing the jury that one could not intend to deprive another of his property if the taker believed in good faith that he had a right or claim to the property. Hendricks argued that the money he took from his victims was owed him for prostitution services. The trial judge, affirmed by the California Supreme Court, rejected the proposed instruction on the state law ground that the claim of right defense is inapplicable to claims based on prostitution. Because this is purely of an issue of state law which the California Supreme Court has resolved against Hendricks, the issue is not cognizable on federal habeas. *Estelle v. McGuire,* —— U.S. at ——, 112 S.Ct. at 480.

■■■ Hendricks also requested an instruction informing the jury that the special circumstances existed only if Hendricks had harbored an intent to steal *before* committing the homicides. Hendricks argues that in returning a robbery special circumstance in the Parmer murder but not in the Haynes murder, the jury was "compromising" due to confusion about the required mental states. In addressing this claim, the California Supreme Court found that Hendricks' proposed instruction might have confused the jury and noted that Hendricks made no attempt to redraft the instruction. *Hendricks,* 44 Cal.3d at 643, 244 Cal.Rptr. 181, 749 P.2d 836. Moreover, the Court found that the instructions given by the trial judge adequately covered the issue of the time of the formation of the intent to steal. *Id.* We agree with this analysis.

■■■ Third, Hendricks argues that the trial judge erred in refusing to give an involuntary manslaughter instruction. Hendricks argues that his confession indicated that he did not harbor the requisite mental state for murder. Accordingly, he claims, the requested instruction was needed. Under California law, a trial judge need not give a requested instruction for which there is no substantial evidence in support. *People v. Flannel,* 25 Cal.3d 668, 684–85, 160 Cal.Rptr. 84, 603 P.2d 1 (1979).

Involuntary manslaughter requires an unintentional killing and, as the California Supreme Court noted, the evidence in the case did not support such a finding:

> [D]efendant shot Parmer six times at point-blank range, the last three times as he lay on the floor unconscious; he shot Haynes five times at point-blank range, the last three times as he lay prone on the bed.

*Hendricks,* 44 Cal.3d at 643, 244 Cal.Rptr. 181, 749 P.2d 836.

■■■ Finally, Hendricks requested but was denied a jury instruction concerning the required mental state for felony murder and for multiple murder. Hendricks argues that such an instruction was required by *Carlos v. Superior Court,* 35 Cal.3d 131, 197 Cal.Rptr. 79, 672 P.2d 862 (1985). He contends that application of *People v. Anderson,* 43 Cal.3d 1104, 240 Cal.Rptr. 585, 742 P.2d 1306 (1987), which overruled *Carlos* concerning jury instructions as to intent, to his case violates certain of his constitutional rights. As Hendricks notes, this court in *Hunt v. Vasquez,* 899 F.2d 878 (9th Cir.1990), has already rejected this argument.

## VII. *Admission of Dr. Reus' Testimony*

Hendricks argues that the trial judge erred in ruling admissible the testimony of Dr. Reus, the government's psychiatrist. Dr. Reus' testimony was based on a conversation he had with Hendricks. Hendricks argues that Dr. Reus' interview violated Hendricks' fifth amendment privilege against self-incrimination and his sixth amendment right to counsel.

During the penalty phase, Hendricks indicated that, for evidence in mitigation, he would call Dr. Carson to testify concerning his mental condition. In response, the government requested that its psychiatrist, Dr. Reus, be allowed to interview Hendricks. Counsel for Hendricks objected that his client was under pressure and would have difficulty talking with Dr. Reus. Overruling this objection, the trial judge permitted the interview. The judge ruled that Dr. Reus would confine his ex-

amination of Hendricks to the scope of Dr. Carson's testimony.

 Hendricks' fifth amendment claim of error is based on Dr. Reus' failure to read Hendricks the *Miranda* warnings before interviewing him. Although the fifth amendment normally bars the government from subjecting the defendant to a psychiatric examination without warning him of his constitutional rights, that bar is waived once the defendant introduces psychiatric evidence in support of a mental defense. *Powell v. Texas*, 492 U.S. 680, 684, 109 S.Ct. 3146, 3149, 106 L.Ed.2d 551 (1989). Because Hendricks introduced psychiatric testimony in support of a mental defense, Hendricks waived any fifth amendment objections to Dr. Reus' interview of him. *Id.*

Hendricks' sixth amendment argument is based on Hendricks' assertion that Dr. Reus' interview exceeded the scope of the trial judge's order allowing the interview. In support of this argument, Hendricks notes that Dr. Reus responded to a question concerning an alleged murder that Hendricks committed at a grocery store. Hendricks also alleges that Dr. Reus testified as to "other inflammatory matters."

 Even where a defendant has waived his fifth amendment objections, he may still claim a sixth amendment deprivation of counsel where the government's psychiatric examination exceeds the scope permitted by the trial judge and where the counsel for the defendant has not been notified that the examination will exceed that scope. *Id.* at 685–686, 109 S.Ct. at 3149–3150.

Hendricks' attempt to bring his sixth amendment claim within *Powell* is unavailing. Dr. Reus' testimony to which Hendricks points as being outside the permissible scope of the court-ordered interview was not based on the interview. The government's question concerning the murder at the grocery store was based on testimony that Hendricks had given himself. Moreover, Hendricks does not indicate what the "other inflammatory matters" were so it is impossible to tell whether such matters, assuming they exist, had anything to do with Dr. Reus' interview.

## VIII. *The Caldwell Claim*

 Hendricks argues that, through his penalty phase summation to the jury, the prosecutor grossly distorted the jury's understanding of its proper role with regard to sentencing, in violation of the eighth amendment. Hendricks claims that the obvious intent and natural effect of the prosecutor's arguments was to remove from the minds of the jury the responsibility for passage of the death sentence. In making this argument, Hendricks relies on *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

Under *Caldwell,* "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death lay elsewhere." *Caldwell,* 472 U.S. at 328–29, 105 S.Ct. at 2639. To make out a *Caldwell* claim, the petitioner must demonstrate that the prosecutor misled the jury as to its sentencing role under state law. *Dugger v. Adams,* 489 U.S. 401, 407, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435 (1989). In this case, the California Supreme Court held that the prosecutor's statements to the jury had been in accordance with California law. *Hendricks,* 44 Cal.3d at 653–55, 244 Cal.Rptr. 181, 749 P.2d 836. We have independently examined the prosecutor's comments for possible *Caldwell* error and find none. The jury could not have been misled as to the gravity of its responsibility. Accordingly, Hendricks' *Caldwell* claim must fail.

 In addition, Hendricks argues that the prosecutor's statements, combined with the trial judge's failure to give a curative instruction for these statements and the judge's actual instruction concerning the jury's role, violated his constitutional rights. Because the prosecutor committed no error, no curative instruction was necessary. Moreover, for his actual instruction, the judge merely read from the statute. Hendricks has not challenged the constitutionality of the statute. Accordingly, Hendricks' second argument is without merit. *See also Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (same jury instruction was constitutional).

## IX. Consideration of Mitigating Evidence

■ Hendricks claims that the trial judge's jury instructions combined with the prosecutor's arguments to the jury prevented the jury from considering all mitigating evidence. This, Hendricks claims, violated his rights under the eighth amendment.

During the penalty phase, the trial judge told the jury that it was permitted to consider as a factor in mitigation "whether the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." This language comes directly from California's statutory death penalty scheme. During its summation, the government emphasized that this mitigating factor required "extreme" disturbance. These actions, Hendricks claims, prevented the jury from considering evidence of mental or emotional disturbance which did not rise to the level of "extreme."

Hendricks' argument fails because the jury in this case was not prevented from considering relevant mitigating evidence. An argument similar to the one put forward by Hendricks was rejected by the Supreme Court in *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990). In *Blystone*, the trial judge had instructed the jury that it could consider as a mitigating factor, evidence of an "extreme" mental or emotional disturbance, but also instructed the jury that it was entitled to consider "any other mitigating matter." *Id.* 494 U.S. at 308, 110 S.Ct. at 1084. Petitioner Blystone argued that the trial judge's instructions had prevented the jury from considering mental disturbance not rising to the level of "extreme." The Court rejected this argument.

In this case, the trial judge gave two jury instructions functionally identical to the ones at issue in *Blystone*. Hendricks' attempt to distinguish *Blystone* by pointing to the prosecutor's emphasis of the "extreme" language is unpersuasive. Any such emphasis only clarified that particular mitigating circumstance. It did not imply that the jurors were barred from considering other relevant mitigating factors including mental or emotional disturbance below an "extreme" level.

## X. Ineffective Assistance of Counsel

■ Hendricks argues that his trial counsel deprived him of his sixth amendment right to the effective assistance of counsel. Hendricks makes his ineffective assistance claim in two parts: guilt phase and penalty phase.

Both parts of Hendricks' claim center on his trial counsel's failure to investigate Hendricks' background in order to present a mental impairment defense. During the guilt phase, counsel presented no evidence. During the penalty phase, counsel called only three witnesses: Hendricks, Hendricks' former girlfriend Rowena Bates, and defense psychologist Dr. Carson. Counsel did not attempt to contact any of Hendricks' family members.

To make out a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's actions were deficient and that the deficiency prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687–90, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984). To demonstrate deficiency, the defendant must show that counsel's actions were "outside the wide range of professionally competent assistance." *Id.* To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

### A. Guilt Phase

Without the benefit of an evidentiary hearing, we cannot determine whether counsel's failure to call any defense witnesses during the guilt phase constituted deficient performance. We cannot determine if counsel's decision was a strategic one, and if so, whether the decision was a sufficiently informed one. ("[S]trategic choices made after less than complete investigation are reasonable precisely to the

extent that reasonable professional judgment supports the limitations on investigation." *Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066.)

Similarly, assuming the performance was deficient, we cannot determine, without the benefit of an evidentiary hearing, whether that performance had any probable effect on the outcome of the guilt phase.

### B. *Penalty Phase*

During the penalty phase, trial counsel produced three witnesses: Dr. Carson, Hendricks, and Hendricks' former girlfriend Rowena Bates. The purpose of these witnesses was to put forward the same defense that counsel had declined to present during the guilt phase—namely a mental impairment defense.

The key to counsel's presentation was the testimony of Dr. Carson. Dr. Carson testified as to Hendricks' traumatic childhood, a triggering event Hendricks experienced while living with Rowena Bates, and the likely effect these had on Hendricks during the commission of the murders. Accordingly, the basis for Dr. Carson's testimony involved incidents from Hendricks' childhood. Only Hendricks could testify from direct knowledge as to his childhood.

In rejecting Hendricks' penalty phase argument, the district court relied on its assertion that the facts of Hendricks' childhood were undisputed at trial. Hendricks, the court concluded, had merely lost a battle of psychiatrists and not a contest of facts. Under this view, any testimony that Hendricks' family members could have given concerning Hendricks' childhood would only have been cumulative. Accordingly, the court concluded that counsel's failure to present this testimony did not constitute deficient performance.

The court's reasoning is faulty because its underlying assertion is incorrect. Indeed, one of the prosecutor's main strategies in cross-examining Dr. Carson was to establish that Hendricks was probably lying about his traumatic childhood. Even reading a cold record, it is clear that this strategy was effective.

Given that one of the prosecution's principal strategies in countering Dr. Carson's testimony was to contest the validity of the facts underlying her theory, and given that defense counsel presented no direct evidence to establish those facts, such evidence may have been useful and not cumulative. Without the benefit of an evidentiary hearing, we cannot determine whether counsel's performance was constitutionally adequate.

Similarly, without an evidentiary hearing, we cannot determine whether counsel's performance had a probable effect on the outcome of the penalty phase.

### C. *Conclusion*

At bottom, both parts of Hendricks' ineffective assistance of counsel claim depend on the reasons for his counsel's decisions. The best way to determine the reasons for counsel's actions would be to hold an evidentiary hearing and ask counsel. Accordingly, we remand Hendricks' ineffective assistance claim of counsel to the district court for an evidentiary hearing.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.