**Randy Lee HELLUM, Plaintiff–
Appellant,**

v.

**WARDEN, UNITED STATES PENITEN-
TIARY–LEAVENWORTH; Hubert H.
Humphrey, III, Attorney General, State
of Minnesota, Defendants–Appellees.**

No. 93–2453.

United States Court of Appeals,
Eighth Circuit.

Submitted March 14, 1994.

Decided July 8, 1994.

---

904

Scott G. Swanson, Minneapolis, MN, argued, for appellant.

Darrell C. Hill, St. Paul, MN, argued, for appellee.

Before MAGILL, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and HANSEN, Circuit Judge.

JOHN R. GIBSON, Senior Circuit Judge.

Robert Lee Hellum appeals the district court's [1] denial of his petition for habeas corpus under 28 U.S.C. § 2254 (1988). A Minnesota jury convicted him of intentional second-degree murder, attempted first-degree murder, second-degree assault, and kidnapping. Hellum argues that the security measures imposed during this trial denied him of his constitutional right to a fair trial. Hellum further challenges the trial court's admission of certain incriminating statements which related to an escape attempt made before his trial. We affirm.

On August 17, 1989, a federal district court sentenced Hellum to 322 months for armed bank robbery and using a firearm in a crime of violence. Twelve days later, Hellum went on an escorted medical appointment. Despite being bound by handcuffs, waist chains and leg shackles, Hellum managed to obtain a gun, commandeer a transport van at gunpoint and escape from custody.

In November 1989, while still a fugitive, Hellum entered a bar in Roseville, Minnesota shortly after midnight. A man was killed, and Hellum was charged and tried. There was extensive conflicting testimony in the trial in which Hellum was convicted, and from which he now seeks habeas relief. Only a brief recital of these facts is necessary.

1. The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

After entering the bar, Hellum consumed several drinks in less than one hour. At some point, Steve Rath, the head bartender, noticed Hellum's uncoordinated behavior and garbled speech. Rath quit serving Hellum, and questioned the manager, Tim Lyke, about getting Hellum a ride home. Lyke talked with Hellum, eventually informing him that the bar would pay for a cab ride home. Hellum twice attempted to leave the bar, but Lyke, assisted by another bartender and a bar patron, frustrated each attempt by blocking the doorway and verbally encouraging Hellum to wait for the cab. After observing that Hellum seemed to be growing more impatient, Lyke decided to call 911 and let the police handle the situation. During the call, Hellum became increasingly concerned and feared that he had been recognized. He made a third attempt to flee, but Rath and two other men apprehended him and returned him to the bar. Hellum then produced a gun which he later testified he carried in order to avoid arrest. He fired the gun in the direction of Lyke, but hit no one. Shortly thereafter, Hellum pulled a crouching bar patron, Scott Brainard, to his feet. After Brainard jerked his body in what witnesses described as a defensive manner, the gun discharged at pointblank range and killed Brainard. Hellum subsequently ordered another patron at gunpoint and upon threat of death to give him a ride. They left the bar together. Hellum then saw a cab arriving at the bar and attempted to flag it down. At this point, Lyke, two patrons, and a bartender emerged from the bar and wrestled Hellum to the ground, where they held him until the police arrived.

Before Hellum's murder trial, authorities discovered a hole that Hellum chipped through the brick and cement of his cell wall, as well as a number of sheets and blankets in his cell tied together. In a statement made after again receiving his *Miranda*[2] rights, Hellum admitted to planning an escape for later in the evening on which the hole was discovered. Portions of this statement were introduced in support of the State's argument that Hellum's actions in the bar were not the result of an irrational drunken acci-

dent, but were instead motivated by his earnest desire to retain his freedom. Later, during a discussion with another deputy regarding events unrelated to the shooting at the bar, Hellum again made incriminating statements which were introduced at trial. According to the deputy, Hellum began discussing the events at the bar. In particular, Hellum mentioned the fact that he wished he had brought his six-inch .38 for more firepower that evening. He further stated that the guy who interfered (Lyke) would have "gone down" if Hellum's gun had not jammed, and that he wished Brainard had lived another few hours so the doctors could have told him and his family that Brainard was going to die. A jury convicted Hellum of intentional second-degree murder, attempted first-degree murder, second degree assault and kidnapping.

After conducting an extensive off-the-record pretrial conference, the trial court imposed several stringent security measures over Hellum's objections. Hellum was handcuffed at all times, and the handcuffs were attached to a waist cable to restrict the movement of his arms. Hellum was also placed in leg irons which permitted him to walk, but not run. Hellum sat at a desk located approximately ten feet behind his counsel's table. The desk obscured the physical restraints from the jury's sight, except when Hellum intentionally made them viewable. Two uniformed, unarmed bailiffs remained at Hellum's side throughout the trial. One, and occasionally two, armed uniformed bailiffs stood at the back of the courtroom. Additional uniformed security personnel remained outside the courtroom. All persons entering the courtroom, including the jurors, passed through a metal detector. The bailiffs removed the gun used in the shooting from the courtroom when it was not the specific subject of testimony, and the gun was not permitted near Hellum. Finally, the court required Hellum to testify from his desk, not from the witness stand.

 Following his conviction and unsuccessful direct appeals, Hellum filed this petition for a writ of habeas corpus. The district court denied the writ, and Hellum appeals.

---

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Hellum argues that the "unprecedented" security measures taken at his trial deprived him of his right to a fair trial. The right to a fair trial is guaranteed by the Sixth and Fourteenth Amendments. *Holbrook v. Flynn*, 475 U.S. 560, 567, 106 S.Ct. 1340, 1345, 89 L.Ed.2d 525 (1986); *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976). Measures which single out a defendant as a particularly dangerous or guilty person threaten this constitutional right. *Estelle*, 425 U.S. at 505, 96 S.Ct. at 1693; *Elledge v. Dugger*, 823 F.2d 1439, 1451 (11th Cir.1987); *United States v. Ferguson*, 758 F.2d 843, 854 (2d Cir.), *cert. denied*, 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985). The Supreme Court has described the use of shackles and prison clothes, for example, as "inherently prejudi-. cial" because they are "unmistakable indications of the need to separate a defendant from the community at large." *Holbrook*, 475 U.S. at 568–69, 106 S.Ct. at 1345–46. "[C]lose judicial scrutiny" is required to ensure that inherently prejudicial measures are necessary to further an "essential state interest." *Estelle*, 425 U.S. at 504, 96 S.Ct. at 1693; *Holbrook*, 475 U.S. at 568, 106 S.Ct. at 1345. Maintaining security is, of course, an essential state interest. *Gilmore v. Armontrout*, 861 F.2d 1061, 1071 (8th Cir.1988), *cert. denied*, 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989). Other measures, such as the use of armed guards in the courtroom are not "inherently prejudicial," but may still be constitutionally impermissible if they pose an "unacceptable risk of prejudice." *Holbrook*, 475 U.S. at 571, 106 S.Ct. at 1347.

▮ The question before us is whether the grounds for additional security which existed at the time the security measures were taken justify any prejudice which they created. However, a federal court has a quite limited role in determining the precise extent of measures permitted in furtherance of a state's essential interest in the security of its courtrooms. A trial court's security decisions must be accorded broad discretion and may be reversed only for abuse. *Gilmore*, 861 F.2d at 1071; *see Wilson v. McCarthy*, 770 F.2d 1482, 1484 (9th Cir. 1985); *Harrell v. Israel*, 672 F.2d 632, 636 (7th Cir.1982); *Payne v. Smith*, 667 F.2d 541, 544 (6th Cir.1981), *cert. denied*, 456 U.S. 932, 102 S.Ct. 1983, 72 L.Ed.2d 449 (1982).

The trial court, before the commencement of the trial, did not articulate the reasons for imposing the security measures. It would have been helpful to us if it had done so. On the other hand, the reasons for the security were stated in substantial detail at the sentencing hearing when the court articulated "a partial list of the reasons for maintaining the high degree of security" during Hellum's trial:

Number one. The defendant has attempted at least five prior escapes, three of which were successful. The last successful escape was while the defendant was handcuffed in the same manner he was handcuffed in the courtroom, and such escape was accomplished with the use of a firearm. The first attempted escape, that the defendant successfully had broken through the jail wall and was very close to being free. The second attempted escape took place just three or four days prior to the commencement of the trial. In at least two of the instances of escape or attempted escape the facts indicate that an accomplice was involved.

Number two. The first escape was accompanied by the defendant's offer to pay a twenty thousand dollar reward for a gun. And the defendant was successful in obtaining that gun. Immediately prior to this trial the defendant made an offer to pay two hundred thousand dollars for a gun.

Number three. The defendant has made statements that there isn't a jail anywhere that can hold him and that his best chance to escape is during the trial and has stated "I will try to escape at any chance I get."

Number four. The defendant has made the threat that he would take someone down with him.

Number five. That the defendant has named and threatened to kill three deputy sheriffs. And this occurred during the trial and immediately prior to the trial.

Number 6. The defendant has spoken of taking hostages during the trial.

Number 7. A close associate of the defendant has made the statement that they were not going to let the defendant go to prison. This statement was made several days prior to the trial.

As Hellum correctly points out, the record does not contain the factual basis for all of the court's reasons for instituting the security measures. Many relevant facts are, however, in the record. For example, the record reflects the details of three prior escape attempts, one of which was successful. Hellum does not dispute the court's statement that he offered money in exchange for assistance in at least one of his prior escapes. The testimony about his August 1989 escape further supports the court's belief that Hellum had previously obtained outside assistance. This evidence was bolstered by Hellum's statement to a deputy that he had "people on the outside that will help." Equally significant are Hellum's repeated expressions of an extreme desire for freedom and a willingness to engage in violence. As Hellum told one deputy, "I consider myself a prisoner of war and I will try to escape at every chance I get." According to the deputy, Hellum stated that "if a good chance for escape would present itself, he would try for it." Hellum also indicated that he had considered taking a deputy hostage. Even Hellum concedes that these facts support the trial judge's imposition of at least some heightened security measures.

■ None of the individual security measures taken by the court is absolutely barred by the Constitution. Although inherently prejudicial, physical restraints such as handcuffs and leg irons are a commonly employed means of controlling potentially violent persons. *See Gilmore*, 861 F.2d at 1071 (affirming use of leg irons); *King v. Rowland*, 977 F.2d 1354, 1358 (9th Cir.1992) ("use of shackles ... did not constitute reversible error"). Such measures as additional security personnel and the use of metal detectors are even less prejudicial because of "the wider range of inferences that a juror might reasonably draw" from their use. *See Holbrook*, 475 U.S. at 569, 106 S.Ct. at 1346 (identifiable courtroom guards are not per se constitutional violation); *State v. Aguilar*, 352 N.W.2d

395, 396–97 (Minn.1984) (no prejudice from use of metal detector). Nor do we believe that the Constitution absolutely bars any of the other security measures taken by the trial court, whether or not they are inherently prejudicial. *See, e.g., Bumpus v. Gunter*, 635 F.2d 907, 914–15 (1st Cir.1980) (upholding separate seating for defendant), *cert. denied*, 450 U.S. 1003, 101 S.Ct. 1714, 68 L.Ed.2d 207 (1981); *Dorman v. United States*, 435 F.2d 385, 397–98 (D.C.Cir.1970) (placement of uniformed guards behind defendant did not create unfair prejudice).

Nonetheless, Hellum contends that the "unprecedented" collection of measures created an impermissible risk of prejudice in this case. We recognize that this collection of security measures indicated to the jury that the State considered Hellum potentially dangerous. However, the courts "have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for alleged criminal conduct." *Holbrook*, 475 U.S. at 567, 106 S.Ct. at 1345. The Court has suggested that measures even more extreme than those taken here may be constitutionally permissible in appropriate circumstances. *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). For example, "in certain extreme situations, 'binding and gagging might possibly be the fairest and most reasonable way to handle' a particularly obstreperous and disruptive defendant." *Holbrook*, 475 U.S. at 568, 106 S.Ct. at 1345 (quoting *Allen*, 397 U.S. at 344, 90 S.Ct. at 1061).

Our review of the record convinces us that the trial court's security measures were well within the limits set by the Constitution. *See Rowland*, 977 F.2d at 1357–58 (upholding conviction obtained at trial where defendant was shackled, guarded by three deputy sheriffs and seated a short distance from counsel because he "displayed a pattern of disruptive and dangerous behavior"). Hellum, through his conduct and speech, demonstrated that he is a determined and violent person. His past escape attempts showed ingenuity and an ability to overcome normal security measures. Finally, the fact that Hellum may

have obtained the assistance of an outside accomplice in earlier escape attempts removes any doubt we might have about the constitutionality of the security measures. The measures taken by the trial court, although severe, were shown to be required by the unique threat posed by Hellum. The trial court did not abuse its discretion in taking the measures.

■ Hellum also contends that statements made in connection with the removal from the courtroom of the gun used in the shooting prejudiced him. At two points during the trial, the prosecutor requested that the gun be removed from the courtroom. At another time, the bailiff instructed the clerk to avoid walking by Hellum with the gun. The jury was present on all three occasions.

We do not consider the prosecutor's statements to rise to the level of prejudicial error. For the reasons stated above, the removal of the gun from the courtroom was a reasonable security precaution which did not unnecessarily single out the defendant as a particularly dangerous or culpable individual. The fact that the prosecutor vocalized the fact that the measure should be taken did not prevent Hellum from obtaining a constitutionally fair trial.

■ The statement by the bailiff is more problematic insofar as it emphasized the connection between the gun's removal and the defendant. The statement was sufficiently quiet as to escape the attention of the prosecutor, and there is nothing to demonstrate that the jury even heard it. Moreover, we are convinced that any error resulting from the statement was assuredly harmless beyond a reasonable doubt. The jury already knew that when Hellum entered the bar, he was an escaped felon and was armed. His language and conduct at trial could only have contributed to an image of potential dangerousness. Thus, the bailiff's statement, like those of the prosecutor, merely told the jury something they already should have known—the gun and the defendant should remain apart.

■ Hellum's final argument contests the trial court's admission of statements he made to investigators following his escape attempt prior to trial. Hellum contends that the interrogation of him outside the presence of his counsel violated his Sixth Amendment right to counsel, despite the fact that he purported to waive this right after being read his *Miranda* rights.

■ The Sixth Amendment states that "[i]n all criminal trials, the accused shall enjoy the right … to have the assistance of counsel for his defense." As Hellum correctly states, the right, once invoked, cannot be waived in a subsequent police-initiated custodial interview. *Michigan v. Jackson,* 475 U.S. 625, 636, 106 S.Ct. 1404, 1411, 89 L.Ed.2d 631 (1986). There is no doubt that Hellum's right to counsel had attached and been invoked prior to his escape attempt and subsequent interrogation. The right to counsel, however, is offense-specific, *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991), and "cannot be invoked once for all future prosecutions." *Id.* Thus, the valid invocation of the right as to one charge will typically have no effect on different charges for which the defendant has not yet been arraigned. *Id.; Hendricks v. Vasquez,* 974 F.2d 1099, 1104 (9th Cir.1992). At least one circuit has suggested a narrow exception to this general rule in cases where the two charges are "inextricably intertwined," *United States v. Hines,* 963 F.2d 255, 257 (9th Cir.1992), or arise from the same incident. *See Hendricks,* 974 F.2d at 1104.

This case falls squarely within the rule laid down in *McNeil.* Hellum does not dispute that the police interrogation occurred during the investigation of Hellum's escape attempt. The attempt was a new crime with distinct elements from the various charges stemming from the events in the bar. Thus, even if we were to adopt the narrow exception applied by the Ninth Circuit, we would reach the same result. *See Hendricks,* 974 F.2d at 1104–05 (refusing to apply exception where defendant was first charged with interstate flight to avoid murder prosecution, and later charged for murder; "the two crimes have totally independent elements").

We affirm the denial of the writ.