**UNITED STATES**

v.

**Master Sergeant Paul R. MILLER,**
**United States Air Force.**

**ACM 31206 (f rev).**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 26 Aug. 1993.

Decided 5 April 2000.

Appellate Counsel for Appellant: William J. Holmes (argued), Colonel Jeanne M. Rueth, Colonel Theodore J. Fink, and Captain Michael J. Apol.

Appellate Counsel for the United States: Major Harold M. Vaught (argued), Colonel Anthony P. Dattilo, Lieutenant Colonel Ronald A. Rodgers, and Major Kenneth A. Arnold.

Before YOUNG, Senior Judge, SPISAK, Senior Judge, and WILCOX, Appellate Military Judge.

### OPINION OF THE COURT UPON FURTHER REVIEW

WILCOX, Judge:

This is the second time we have considered this case. *See United States v. Miller*, 44 M.J. 549 (A.F.Ct.Crim.App.1996). After our first consideration, the United States Court of Appeals for the Armed Forces ordered a post-trial fact-finding hearing to help resolve an issue raised by the appellant, specifically:

WHETHER APPELLANT WAS DENIED HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL BEFORE AN IMPARTIAL COURT BECAUSE THE COURT MEMBERS WERE SUBJECTED TO EXTRANEOUS CONSIDERATIONS WHICH MATERIALLY PREJUDICED APPELLANT AND VIOLATED HIS CONSTITUTIONALLY PROTECTED PRESUMPTION OF INNOCENCE IF THE MEMBERS' KNOWLEDGE ABOUT ALLEGED THREATS AND THE SECURITY PROCEDURES EM-

PLOYED IN COURT WERE MATERI-ALLY PREJUDICIAL TO APPEL-LANT'S RIGHT TO A FAIR TRIAL.

*United States v. Miller,* 47 M.J. 352 (1997). With that hearing completed, the record has been returned to us. The appellant now asserts he was denied his right to a fair trial and his right to a presumption of innocence. With the additional evidence provided by the post-trial hearing, we find the appellant's assertions to be meritless.

## I. FACTS

At his trial, the appellant was accused of partying with street kids while his wife was away from their home. The details of those events are unimportant to this decision. Before trial, the Air Force Office of Special Investigations (AFOSI) became concerned that additional security was needed because the appellant's son was suspected of gang affiliation and several of the witnesses and victims had criminal records. Prior to trial, the prosecutor had special security measures put into place. These included a metal detector at the entrance to the courtroom, secured entrances to the courtroom, and armed AFOSI agents and security police personnel in and around the courtroom. The military judge approved the measures. These security measures piqued the curiosity of several of the court members. As a result, after the trial had started, the court president asked the Staff Judge Advocate (SJA) about the security measures. The SJA's response and the follow-on actions of the president are at issue.

## II. FAIR TRIAL AND THE PRESUMPTION OF INNOCENCE

The appellant contends that he was unable to receive a fair trial because of three factors: (1) the court members were betting on the outcome of the trial; (2) excessive security measures deprived the appellant of the presumption of innocence in the eyes of the court members; and (3) the members were subject to unlawful command influence.

■ We review due process complaints using a *de novo* standard. *United States v. Collier,* 36 M.J. 501, 504 (A.F.C.M.R.1992).

We review the implementation of security measures by a military judge using an abuse of discretion standard. *Hellum v. Warden, United States Penitentiary–Leavenworth,* 28 F.3d 903, 907 (8th Cir.1994). Finally, we review claims of unlawful command influence as a claim of constitutional error using a beyond a reasonable doubt standard. *United States v. Biagase,* 50 M.J. 143, 150 (1999).

### A. Betting on the Trial Outcome

The appellant contends that two members of the court panel were betting on the outcome of the case during trial. To support this contention he offered the testimony of two witnesses who were found by the military judge who presided over the post-trial hearing to be totally without credibility. We concur. We are convinced beyond a reasonable doubt that the court members were not betting on the outcome.

### B. Security Measures

The appellant claims that the use of security measures by the court prevented him from receiving a fair trial. He contends that in the face of such "extreme security measures" court members could not have maintained the presumption of innocence. In the absence of authoritative statutory or case law in military jurisprudence regarding this matter, we look to federal courts for guidance. *See United States v. Lopez,* 35 M.J. 35, 39 (C.M.A.1992).

■ Certain trial practices pose a threat to the "fairness of the factfinding process" such that they are subject to "close judicial scrutiny." *Holbrook v. Flynn,* 475 U.S. 560, 568, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986) (quoting *Estelle v. Williams,* 425 U.S. 501, 503–504, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976)). Indeed some security measures employed at trial can be so inherently prejudicial that they deprive an accused of the right to an impartial jury. *Holbrook,* 475 U.S. at 570, 106 S.Ct. 1340. But not every security measure is "inherently prejudicial." The trial judge's use of security measures is accorded broad discretion. *Hellum,* 28 F.3d at 907. If the challenged practice is not inherently prejudicial, then the accused must show actu-

al prejudice. *Holbrook,* 475 U.S. at 572, 106 S.Ct. 1340.

 Just prior to trial, the military judge was briefed concerning the possible affiliation of the appellant's son with a local gang and of the criminal records of witnesses and victims. Based on this information, the military judge approved the use of a metal detector at the entrance to the courtroom, closed other entryways to the courtroom, and permitted an AFOSI agent in mufti to sit in the courtroom during the trial. We hold that under these circumstances, the military judge did not abuse her discretion in approving these measures.

 The use of in-court security officers and metal detectors are not inherently prejudicial. *See United States v. Darden,* 70 F.3d 1507, 1534 (8th Cir.1995). Thus we must determine whether the appellant has demonstrated prejudice in this case as a result of the measures employed by the trial court. *Holbrook,* 475 U.S. at 572, 106 S.Ct. 1340. He has not. Some of the court members thought the security measures were normal for courts-martial. Some recognized the heightened security but gave it no additional thought. Some speculated as to why the measures were in place but gave it no great consideration. Regardless, none of the court members felt the measures were particularly onerous or distracting; none held the appellant responsible for the extra security; and none thought that it had any impact at all on their deliberations or on their ability to listen to and consider all the facts of the case fairly and impartially. We hold there was no prejudice as a result of the security measures adopted by the trial court.

## C. *Unlawful Command Influence*

The appellant alleges his trial was subject to unlawful command influence because of improper contact between the court president and the SJA. In short, the appellant contends that contact between the SJA and the president, during which they discussed the enhanced security measures surrounding the trial, amounted to unlawful command influence. His failure to demonstrate prejudice, either through direct evidence or through the operation of a presumption,

leads us to conclude that the appellant suffered no harm.

 Although the application of a presumption in cases involving unlawful command influence has not always been clear, in its most recent decision regarding unlawful command influence, our superior court has concluded that an accused need only "show facts which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its *potential* to cause unfairness." (Emphasis added). *Biagase,* 50 M.J. at 150. Once an accused has raised the issue of unlawful command influence and prejudice by means of a presumption or otherwise, it is clear that the government must show beyond a reasonable doubt (1) that the facts upon which the claim of unlawful command influence is predicated do not exist; or (2) that the facts do not constitute unlawful command influence; or (3) that the unlawful command influence did not affect the findings and sentence. *Biagase,* 50 M.J. at 151.

Prior to trial, the appellant had seen Colonel (Chaplain) Boone for counseling. Chaplain Boone took an interest in the appellant's family and his case. At one point, Chaplain Boone interceded in an attempt to lessen the appellant's pretrial confinement conditions. He followed the trial proceedings closely. At the post-trial hearing, Chaplain Boone testified that, after the trial was concluded, the court president told him that he and the other court members were aware of the threats against the prosecutor and the military judge *during the trial.* In contrast, the president testified that he did not learn of these threats until after trial and that, in response to his question during trial, the SJA told him that the measures were taken for the protection of the appellant. The president also testified that he did not report this information to the court members, although he may have shared the information with a few members who expressed an interest. Regardless of which version of the conversation is correct, the SJA's conversation with a court member concerning the details of an on

going court-martial was improper and logically connected to the court-martial.

■ Assuming *arguendo* that the contact between the SJA and the court president constitutes unlawful command influence, we next look to see if the proceedings were unfair, and, if so, whether the unfairness was proximately caused by the unlawful command influence. The evidence convinces us beyond a reasonable doubt that the proceedings were fair in this case despite the improper contact between the SJA and the court president.

Two affidavits prepared by Chaplain Boone shortly after the events in question took place conflict with his testimony. These affidavits indicate that during their post-trial discussion of the case, the court president, "did not say how the jury learned this information or from whom it came from (sic) nor *when* they learned it, nor did [Colonel Boone] ask." (Emphasis added). Colonel Boone testified that by this he meant that he was uncertain when *during trial* the members learned the specifics of the threats but that he was certain from his conversation with the court president that the court members knew the specifics sometime during trial. We are convinced by evidence to the contrary that Colonel Boone is mistaken.

The SJA, the court president, and all of the court members recall the facts differently from Colonel Boone. The SJA could recall little but was willing to agree with the court president who testified that the SJA told him that the security measures were in place to protect the appellant. The court president likewise recalled that while the topic of security was mentioned by several of the members, he did not brief them on the information he learned from the SJA, although he may have mentioned it to the few who asked him directly. This testimony is supported by all of the court members. None of them recalled being briefed by the president on the reasons for the security, and none knew any of the details of specific threats against the appellant, the prosecutor, the military judge, or themselves until after the trial had concluded. Based on this evidence, we are convinced beyond a reasonable doubt that the government's version of the events is correct and that Colonel Boone's version is

the result of an incomplete, casual, and misunderstood communication between him and the court president.

Additionally and more importantly, the court members all testified that, regardless of whether they learned of the security measures by observation or by being told by the court president, it had no impact on them or their participation at trial. Their testimony is persuasive. We are not surprised to learn that military personnel selected by the convening authority because of their age, education, training, experience, length of service, and judicial temperament are not dismayed or distracted by security measures. Nor are we surprised to hear them testify that they are able to perform their military duties, including sitting as impartial court members, in the face of heightened security measures. Thus, we find beyond a reasonable doubt that the improper conversation between the SJA and the court president which took place during trial regarding court security had no impact on the fairness of the trial.

### III. OTHER MATTERS

The appellant has also asserted that the findings of guilty pertaining to specifications of pandering which were later determined on appeal to be specifications alleging solicitation for prostitution services, and upheld as such, are incorrect as a matter of law. As to this and all other remaining issues, we adopt the original opinion of this Court. We affirm the findings and sentence of the trial court as amended by this Court on its first consideration.

### IV. CONCLUSION

Accordingly, we conclude that the approved findings of guilty and the sentence as modified by this Court are correct in law and fact and, on the basis of the entire record are

AFFIRMED.

Senior Judge YOUNG and Senior Judge SPISAK concur.