Jaturun SIRIPONGS, Petitioner–Appellant,

v.

Arthur CALDERON, Warden, Respondent–Appellee.

No. 92–56498.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 21, 1993.

Decided July 1, 1994.

As Amended on Denial of Petitions for Rehearing and Suggestions for Rehearing En Banc Oct. 13, 1994.

Donald L. Morrow and Linda Schilling, Paul, Hastings, Janofsky & Walker, Costa Mesa, CA, for petitioner-appellant.

Laura Whitcomb Halgren, Deputy Atty. Gen., San Diego, CA, for respondent-appellee.

Janice L. Bergmann, California Appellate Project, San Francisco, CA, for amicus.

Before: SCHROEDER, PREGERSON, and FERNANDEZ, Circuit Judges.

Opinion by Judge SCHROEDER; Concurrence and Dissent by Judge FERNANDEZ.

SCHROEDER, Circuit Judge:

The petitioner-appellant Jaturun Siripongs, a native of Thailand, was convicted of first-degree murder and sentenced to death for a violent robbery/double homicide in a Los Angeles Asian specialty food market. His state appeal and two state petitions for collateral relief were unavailing, and he unsuccessfully sought habeas relief in the district court. The critical issue in this appeal is whether he is entitled to an evidentiary hearing in the district court on his claims of ineffective assistance of counsel.

It is undisputed that Siripongs' trial counsel put on no defense at the guilt phase of the trial. In addition, trial counsel conducted little or no investigation into the possibility of contending, either at the guilt phase or at the penalty phase, that the murders had been committed by an accomplice. Counsel conducted no inquiry into Siripongs' background in Thailand, where Siripongs was born, raised and lived until two years before the crimes in question. It is further undisputed that counsel had never before tried a capital case, and that counsel was running for Congress during most of the time that he should have been preparing the case for trial.

In a capital case, a habeas petitioner who asserts a colorable claim to relief, and who has never been given the opportunity to develop a factual record on that claim, is entitled to an evidentiary hearing in federal court. *Smith v. McCormick*, 914 F.2d 1153, 1170 (9th Cir.1990); *see Hendricks v. Vasquez*, 974 F.2d 1099, 1103, 1109–10 (9th Cir.

1992). Siripongs has never received an evidentiary hearing in state or federal court, and has raised a colorable claim. We therefore hold that Siripongs is entitled to an evidentiary hearing in order to develop the record on his ineffective assistance of counsel claims.

Siripongs presents a number of additional contentions of trial court error that require no further evidentiary development. We agree with the district court that these contentions do not warrant habeas corpus relief and otherwise affirm the judgment of the district court.

### FACTS AND PROCEDURAL BACKGROUND

The evidence introduced against Siripongs at trial was all circumstantial but voluminous. The details are contained in the opinion of the California Supreme Court affirming the conviction and sentence. *People v. Siripongs,* 45 Cal.3d 548, 247 Cal.Rptr. 729, 732–37, 754 P.2d 1306, 1309–13 (1988), *cert. denied,* 488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 810 (1989). We only summarize.

Surachai ("Jack") and Packovan ("Pat") Wattanaporn owned the Pantai Market in Garden Grove, California. Quach Nguyen worked as a clerk at the market in December 1981. At approximately 2:00 p.m. on December 15, 1981, Jack Wattanaporn discovered the bodies of Pat Wattanaporn and Quach Nguyen on the floor of the storeroom of the market. Pat had been strangled to death, and Nguyen had died of multiple stab wounds. Pat had used the market storeroom to buy and sell jewelry. Jewelry that Pat had been seen wearing on the day of the murders was missing from the crime scene.

Near the bodies was a letter addressed to a sister of Siripongs' girlfriend, Sainam Peung "Peung" Vecharungspri. The sister was known as "Noon." Evidence at trial established that Noon had placed the letter in her jacket, which she kept at Siripongs' house.

Siripongs arrived at Peung's house at 3 p.m. on the afternoon of December 15 with his fingers bandaged and bleeding. He claimed that he had cut himself at work that day. Later that afternoon Siripongs called a friend whom he owed money and asked the friend to help him sell some jewelry. This jewelry later was identified as belonging to Pat.

The following day Pat's purse was found in a dumpster some distance from the market. The dumpster was a short distance from Peung's house in a shopping complex housing the laundromat used by Siripongs. Also in the dumpster were the jacket owned by Noon that had contained the letter found at the crime scene, a blood-stained shirt, and other incriminating articles, including a cord similar to a cord which was found wrapped around Nguyen's arm at the crime scene, hair that was consistent with Pat's hair, and items from the Pantai Market. An analysis of the blood stained items revealed that the blood on the items was consistent with Siripongs' blood, although a conclusive match could not be made.

Siripongs, who worked as an optical lens grinder, had not reported to work on the day of the murder. He returned to work on December 17th. Later that afternoon, Siripongs attempted to make a purchase using a credit card issued to Jack Wattanaporn, and it was a credit check on that card which led to Siripongs' arrest. After his arrest, police discovered other credit cards issued to Pat and Jack in Siripongs' wallet.

Four hours after his arrest, Siripongs was allowed to make his first phone call, which he conducted in Thai. His conversation was recorded, on a concealed tape recorder, by an officer who stood next to Siripongs while he made the call. In the conversation, Siripongs asked Peung to go to his house to find and remove jewelry which had been worn by Pat and other items from the Pantai Market. A search of Siripongs' car and residence revealed more jewelry matching descriptions of Pat's jewelry, as well as department store receipts dated after her death but bearing her name.

At trial, Siripongs put forth no affirmative defense and called no witnesses. Counsel's primary defense tactic was to cross examine the state's witnesses and criticize the state's evidence. Defense counsel's presentation at the penalty phase was very brief. Counsel called Siripongs' employer, who stated that the defendant was a good worker, and also

called witnesses to testify that since his arrest, Siripongs had been a model prisoner. The defense presented no testimony from Siripongs' family or friends, although Siripongs' mother was present in the courtroom during the penalty phase.

The jury convicted Siripongs of murder and sentenced him to death. The California Supreme Court, on direct appeal, affirmed the conviction and sentence. *People v. Siripongs,* 45 Cal.3d 548, 247 Cal.Rptr. 729, 754 P.2d 1306 (1988). The United States Supreme Court denied certiorari. *Siripongs v. California,* 488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 810 (1989).

Siripongs filed a petition for writ of habeas corpus, and an accompanying motion for discovery, in the California Supreme Court, raising, among other contentions, claims of ineffective assistance of trial counsel at the guilt and penalty phases. The petition was denied on the merits without a hearing.

Siripongs raised the ineffective assistance of counsel claims, and several additional claims, in his first federal court petition for writ of habeas corpus. The district court stayed the proceedings to permit Siripongs to exhaust the new claims in state court in a second state petition for collateral relief. In the second state petition, Siripongs raised claims of interpreter bias, trial judge bias and ineffective assistance of counsel for counsel's failure to move for a mistrial on grounds of juror misconduct.

The California Supreme Court denied Siripongs' second petition without a hearing, stating in full:

> Petition for writ of habeas corpus DENIED both for reasons of procedural default and on the merits. Petitioner's motion for 'post-trial discovery' is denied (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1261 [275 Cal.Rptr. 729, 800 P.2d 1159]).

The parties and amicus curiae have given the form of the California Supreme Court's order a great deal of attention in this appeal. The dispute is whether the California Supreme Court should be regarded as having foreclosed federal court litigation of the claims made in the second petition by disposing of them on an independent and adequate state ground.

Following the California Supreme Court's denial of the second petition, Siripongs filed, in May 1991, a motion to conduct discovery in connection with his pending federal habeas petition. The district court granted Siripongs' motion to a limited extent, ordering that he be permitted to take the deposition of his trial counsel. Siripongs also sought an evidentiary hearing on his claims. The state opposed the motion for evidentiary hearing and moved for summary judgment. Siripongs' request for a hearing was supported by affidavits of expert witnesses as to the inadequacy of trial counsel's preparation and performance at both the guilt and penalty phases of the trial court proceedings. The district court did not hold a hearing, and, in October 1992, granted the state's motion for summary judgment and denied all of Siripongs' pending motions and requests for discovery. The district court granted Siripongs' request for a certificate of probable cause and stayed his execution for the pursuit of this appeal.

### INEFFECTIVE ASSISTANCE OF COUNSEL

■ Siripongs seeks an evidentiary hearing on his claims of ineffective assistance of counsel at both the guilt and penalty phases of his trial. As previously noted, these claims were summarily denied by the California Supreme Court in Siripongs' first state court habeas petition.

In district court, Siripongs' federally appointed counsel greatly supplemented the materials presented in support of his request for an evidentiary hearing. The materials included, in addition to the deposition of trial counsel, two detailed affidavits of potential expert witnesses. The first affidavit was that of an experienced public defender who reviewed the transcripts from the trial to assess the adequacy of trial counsel's preparation and performance. The second affidavit was that of an anthropologist expert in Thai culture who explained the potential relevance of evidence of Siripongs' culture to the jury's deliberations during both the guilt and penalty phases.

The district court record also included the affidavit of a psychologist who originally ex-

amined Siripongs at the request of trial counsel to determine Siripongs' mental condition. This psychologist stood ready to testify at the penalty phase, and he explains that his testimony would have been beneficial in explaining petitioner's mental condition to the jury and making it less likely to sentence him to death. Trial counsel did not call this expert at the penalty phase.

Siripongs' principal contention on appeal is that he is entitled to an evidentiary hearing on his claim that trial counsel's failure to investigate the existence of accomplices to the crime deprived him of effective assistance of counsel. The deposition of trial counsel establishes that counsel did not investigate or pursue the possibility that an accomplice was involved in the crime, even though he was of the belief, after interviewing his client before trial, that others were involved in the crime.

Apart from the expert affidavits, present counsel points to material in the trial court record supporting the claim of ineffectiveness. Specifically, counsel points to physical evidence suggesting that others were involved in the crime. For example, a strand of brown hair was found on the ring finger of one of the victims, which, according to the prosecution's witnesses, did not match the hair of either of the victims or Siripongs. Similarly, hair and blood, which could not be identified as belonging to Siripongs or the victims, was found in the dumpster in which the police found items from the robbery. Clothing found in the dumpster after the crime, which was believed to have belonged to Siripongs, did not contain optical grinding material which would have been present on his clothing if he had worn the clothing to work. Five types of shoeprints were found at the crime scene, of which two have never been identified. Blood was found on both the front passenger and rear seats of Siripongs' car, as well as on the passenger kickplate, suggesting that more than one person was in Siripongs' car at the time the crime was committed. Siripongs was cut on both hands, injuries which according to prosecution witnesses, could have been defensive cuts if Siripongs had actually attempted to prevent the killings, as he now claims is the case. Trial counsel did not meaningfully pursue or conduct any forensic testing on this evidence, and has not offered any explanation for his failure to do so. The district court granted summary judgment without permitting Siripongs to conduct any forensic testing.

There also is evidence in the record suggesting that a person by the name of Chartree Sakulsingh was involved in the crimes. A witness at trial had told investigating officers that he received a call from a Thai male who threatened to kill him if he testified about the murders. When asked who might have made the call, he implicated Chartree. In addition, associates of Siripongs, including his girlfriend Peung, Peung's sister Noon, and the boyfriend of another of Peung's sisters, provided conflicting stories about their whereabouts at the time of the murders. For example, Peung told a police investigator that on the day of the crime, she picked up Noon at school at 2:00 p.m. Noon, however, told the police that although she went to school on that day, she became ill and left before 11:00 a.m. The whereabouts of the boyfriend of Peung's sister at the time of the crimes has never been accounted for.

Despite these leads, and despite his own belief that accomplices were involved, trial counsel did not pursue these leads and mounted no defense whatsoever beyond forensic attempts to maximize the state's burden of proof or point out possible inconsistencies in its evidence. Trial counsel had never before tried a capital case, and he now admits that he was distracted by campaigning for federal office.

The affidavit of expert defense counsel, submitted in connection with this petition, explains in detail what competent counsel would have done to investigate the accomplice defense and explained why such a defense, if presented by competent counsel, might well have affected the jury's verdict. The expert opines that trial counsel's performance was deficient because, among other things, he failed to seek forensic testing of the physical evidence, failed to interview witnesses and otherwise follow up on leads indicating multiple involvement, and failed to present a complete picture of the defendant at the penalty phase.

The ultimate burden which must be borne if Siripongs is to succeed on his ineffective

assistance of counsel claim, is to show both that trial counsel's performance was defective and a reasonable probability that, but for the deficient performance, the outcome of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). The issue before us, however, is not whether Siripongs actually was deprived of his Sixth Amendment right to effective assistance of counsel, but only whether he is entitled to a hearing in order to try to establish that claim.

■ A petitioner in a capital case is entitled to an evidentiary hearing where there has been no state court evidentiary hearing and the petitioner raises a "colorable" claim of ineffective assistance. *Smith v. McCormick*, 914 F.2d 1153, 1170 (9th Cir.1990); *Hendricks v. Vasquez*, 974 F.2d 1099, 1103, 1109–10 (9th Cir.1992). *See also Morris v. California*, 966 F.2d 448, 454 (9th Cir.1991) (non-capital case; remand for evidentiary hearing required where allegations in petitioner's affidavit raise inference of deficient performance), *cert. denied*, —— U.S. ——, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992). *Cf. Shah v. United States*, 878 F.2d 1156, 1159–60 (9th Cir.) (non-capital case; no evidentiary hearing required where petitioner's allegations as to counsel's advice are "patently frivolous and totally incredible."), *cert. denied*, 493 U.S. 869, 110 S.Ct. 195, 107 L.Ed.2d 149 (1989). In *Smith*, the defendant initially pled not-guilty, but thereafter changed his plea to guilty and asked to be put to death. We held that the defendant was entitled to an evidentiary hearing, in a habeas proceeding, on his Sixth Amendment claim that counsel was ineffective in failing to seek a psychiatric evaluation to determine whether the defendant was competent to change his plea. *Smith*, 914 F.2d at 1170. In *Hendricks*, the defendant, after being sentenced to death for murdering two people, was granted an evidentiary hearing on his claim that counsel was ineffective in failing to investigate and pursue a mental impairment defense. *Hendricks*, 974 F.2d at 1109–10.

Based on these authorities, and after reviewing the forensic evidence, the other evidence in the record, the expert affidavits, and the deposition of trial counsel in this case, we are convinced that Siripongs has presented at least a colorable claim of ineffective assistance of counsel. We note that the credibility and accuracy of the averments of the experts has never been materially questioned by the state or the district court. The district court nevertheless denied petitioner's request for an evidentiary hearing. The district court advanced two principal reasons.

The first was the court's acceptance of the contention by the state that counsel's decision not to pursue an accomplice defense, indeed even to investigate such a defense, was justified as a "tactical" decision, because the mounting of such a defense would involve an admission that the defendant was at the crime scene at the time of the murders. This record, however, does not contain any evidence from which it can be inferred that trial counsel's decision not to mount a defense at trial was the result of an informed, tactical decision. The Supreme Court has observed that the trial process generally does not function properly "unless defense counsel has done some investigation into the prosecution's case and into various defense strategies." *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 2587, 91 L.Ed.2d 305 (1986). The accomplice defense was trial counsel's only viable defense, and the existing record reflects that defense counsel did not investigate it adequately.

We held in *Hendricks v. Vasquez*, on a far leaner record than this, that an evidentiary hearing was required to determine whether counsel's failure to call any defense witnesses during the guilt phase of a death penalty conviction constituted deficient performance. We said that "[w]ithout the benefit of an evidentiary hearing ... [w]e cannot determine if counsel's decision was a strategic one, and if so, whether the decision was a sufficiently informed one." *Hendricks*, 974 F.2d at 1109. Quoting *Strickland v. Washington*, we observed that strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitations on investigation." *Id.* at 1109–10. As in *Hendricks*, an evidentiary hearing is necessary in this case to establish, first, whether counsel's decision not to pursue an accomplice defense was in fact a tactical deci-

sion, and, second, whether that decision was sufficiently informed.

Furthermore, even assuming the decision not to pursue an accomplice theory at the guilt phase was a tactical one, Siripongs has made at least a colorable claim that counsel's failure to pursue the accomplice defense amounted to deficient performance at the penalty phase of the trial. There is no apparent conceivable tactical advantage in refraining from contending at the penalty phase that someone else may have been responsible for the actual murders. As we stated in *Mak v. Blodgett,* 970 F.2d 614, 619 (9th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1363, 122 L.Ed.2d 742 (1993), "to fail to present important mitigating evidence in the penalty phase—if there is no risk in doing so—can be as devastating as a failure to present proof of innocence in the guilt phase."

The district court erred in granting summary judgment on the basis of the state's contention that the decision not to put on an accomplice defense was a sound tactical strategy in both the guilt and penalty phases.

The second reason why the district court granted summary judgment to the government without an evidentiary hearing on the accomplice defense was its view that such a defense would have been inherently incredible in light of Siripongs' refusal to come forward with the name of any accomplice. It is here, however, that the affidavit of the anthropologist reinforces Siripongs' claim by explaining how Siripongs' refusal to identify accomplices was consistent with deeply imbedded Thai cultural values, including cultural concepts of shame and dishonor, and with Thai religious beliefs. Competent counsel undertaking to represent defendants with unique cultural backgrounds have an obligation at least to consider the effect of that background on their clients' conduct. *Cf. Mak,* 970 F.2d at 617–19. Without the benefit of an evidentiary hearing, we cannot conclude that Siripongs' failure to identify accomplices *per se* excused defense counsel from presenting, or at least investigating, an accomplice defense.

Respondent offers another basis for affirming the district court. Respondent contends that in light of the overwhelming evidence linking Siripongs to the scene of the crime, any deficient performance by counsel was not prejudicial because the jury would have rejected an accomplice defense and concluded that Siripongs actually committed the violent murders himself. Under similar circumstances, we have observed that if a hearing is necessary on the question of deficient performance, it is generally likely that a hearing also will be required for determination of whether the alleged deficient performance probably influenced the outcome of the trial. *See Hendricks,* 974 F.2d at 1110. In this case, if the jury had found only that Siripongs participated in a robbery in which the murders occurred, Siripongs would not have been eligible for the death penalty. At the time of trial, an accomplice to a crime in which a death occurred could not receive the death penalty pursuant to a felony-murder statute if the defendant did not commit the murder or have the intent to kill. *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Without the benefit of an evidentiary hearing, and without a better sense of the potential strength of this defense, we simply cannot conclude as a matter of law that there is no reasonable probability that pursuit of an accomplice defense would have left the jury with a reasonable doubt as to whether Siripongs committed the murders or intended that they occur.

Moreover, even if the accomplice theory had been pursued only at the penalty phase, it might have reduced the likelihood of a death sentence. *Cf. Enmund,* 458 U.S. at 794, 102 S.Ct. at 3375 (discussing reluctance of juries to impose death penalty for accomplice liability). In addition, under California law, a defendant may provide evidence of "residual doubt" as to his guilt during the penalty phase. *People v. Johnson,* 3 Cal.4th 1183, 14 Cal.Rptr.2d 702, 741–742, 842 P.2d 1, 40–41 (1992), *cert. denied,* — U.S. —, 114 S.Ct. 114, 126 L.Ed.2d 80 (1993); *People v. Terry,* 61 Cal.2d 137, 37 Cal.Rptr. 605, 390 P.2d 381, *cert. denied,* 379 U.S. 866, 85 S.Ct. 132, 13 L.Ed.2d 68 (1964). Presentation of accomplice evidence at the penalty phase could well have created such a doubt.

The claims of ineffective assistance of counsel are not limited to counsel's failure to

pursue an accomplice theory. Affidavits in the record state that counsel was well below accepted standards in failing to conduct more than a cursory investigation of Siripongs' background and in making no attempt to humanize him before the jury. The affidavits of the anthropologist and expert defense counsel provide examples of evidence which should have been introduced at the penalty phase to humanize Siripongs before the jury. *Mak,* 970 F.2d at 619. Among other things, counsel could have introduced evidence of Siripongs' troubled childhood, his mother's efforts to keep his family together, and Siripongs' lack of any history of violent crime. Similarly, evidence of Siripongs' Thai culture, including Thai concepts of remorse and shame, might well have bridged a cultural gap between the jury and the accused. *Cf. Mak,* 970 F.2d at 618–19, 620.

The only explanation offered for counsel's failure to put on any of this mitigating evidence, including testimony of Siripongs' mother who was present in the courtroom, was counsel's fear that such evidence would open the door to impeachment by evidence of Siripongs' prior involvement in a burglary in Thailand. However, the trial court ruled that so long as the mitigating evidence went to Siripongs' lack of a violent past and did not go to describe his moral character, the conviction would remain off limits as an impeachment device. As a caveat, the court noted that its ruling was tentative, and that if reliable evidence was produced showing that the crimes were in fact violent, the court might reconsider. Apparently, this threat alone was sufficient to deter counsel from presenting the potentially significant mitigating evidence, even though counsel appears to have failed to investigate and determine whether the Thai offense involved violence.

Few aspects of representation can be more critical than understanding the client's criminal history. Counsel apparently lacked this understanding. The mitigating evidence counsel chose not to introduce, based on an inadequate understanding of his client's history, would undoubtedly have improved Siripongs' chances of receiving a life sentence rather than the death penalty. *See Mak v. Blodgett,* 970 F.2d 614 (9th Cir.1992) (affirming district court's finding of deficient performance where counsel failed to present hu-

manizing evidence at the penalty phase, after an evidentiary hearing on claims remarkably similar to those in the instant case).

In sum, the district court should not have granted summary judgment to the government on Siripongs' claims of ineffective assistance of counsel at the guilt and penalty phases. Petitioner is entitled to an evidentiary hearing and the resolution of these claims by the district court on the basis of a fully developed factual record.

## INTERPRETER BIAS

Siripongs seeks an evidentiary hearing on his claim of denial of due process, in which he alleges that an interpreter used in the trial court was, unbeknownst to defense counsel, a friend of one of the murder victims and her family, and therefore was biased against the defendant. The district court dismissed the claim on procedural grounds, ruling that the claim could not be pursued in federal court because the California Supreme Court had denied relief on independent grounds of procedural default under state law. *See Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). We must therefore initially address whether the California Supreme Court's decision rested on an adequate and independent state ground so as to preclude federal relief.

This claim and two others were contained in Siripongs' second petition for writ of habeas corpus, which the California Supreme Court denied in a brief order, stating:

> Petition for writ of habeas corpus DENIED both for reasons of procedural default and on the merits. Petitioner's motion for "post trial discovery" is denied (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1261 [275 Cal.Rptr. 729, 800 P.2d 1159]).

The California Supreme Court did not expressly state that each of the claims were denied on the basis of an independent procedural bar, nor did it identify any particular procedural rule upon which it relied for default.

The district court "placed great weight on respondent's opposition to petitioner's state habeas." That opposition discussed procedural bases for denying each of petitioner's

claims and requested a finding of procedural default as to each. The district court concluded, on the basis of the opposition, which was not referred to in the California Supreme Court's order, that the Supreme Court did in fact decide that petitioner had procedurally defaulted on each of the claims on the grounds stated in the opposition.

The need to determine when a state court decision rests upon independent and adequate state grounds so as to preclude an application for federal relief, has raised some thorny problems in recent years. If federal courts are to require a federal petitioner to exhaust state court remedies before seeking redress in the federal court, *Rose v. Lundy*, 455 U.S. 509, 515, 102 S.Ct. 1198, 1201, 71 L.Ed.2d 379 (1982), then federal courts should not permit a petitioner who has defaulted on his state remedies to pursue a claim in federal court. To do so would undermine the goal of ensuring that state courts have an opportunity to address federal claims in the first instance. *Coleman v. Thompson*, 501 U.S. 722, 729–32, 111 S.Ct. 2546, 2554–55, 115 L.Ed.2d 640 (1991); *Rose*, 455 U.S. at 515, 102 S.Ct. at 1201 (quoting *Ex parte Royall*, 117 U.S. 241, 251, 6 S.Ct. 734, 740, 29 L.Ed. 868 (1886)); *see Engle v. Isaac*, 456 U.S. 107, 125 & n. 28, 102 S.Ct. 1558, 1570 & n. 28, 71 L.Ed.2d 783 (1982). On the other hand, if a petitioner has been denied relief in state court for any reason other than failure to pursue available state court remedies, there is a risk that a petitioner may be denied access to federal courts for a federal habeas corpus claim that Congress intended federal courts to decide. It is not always easy to determine why a state court denied a petitioner relief.

To help federal courts resolve these issues, in related situations involving direct review of state court decisions, the Supreme Court in *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), adopted a conclusive presumption that a state decision does not rest on an independent and adequate state law ground unless the decision states "clearly and expressly that it is ... based on bona fide separate, adequate, and independent grounds." *Id.* at 1041, 103 S.Ct. at 3476. Thus, unless the state court makes clear that it is resting its decision denying relief on an independent and adequate state ground, it is presumed that the state denial was based at least in part upon federal grounds, and the petitioner may seek relief in federal court.

In *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), the Court expressly adopted the *Long* presumption in federal habeas cases. The Supreme Court summarized in *Coleman v. Thompson*, 501 U.S. 722, 734–36, 111 S.Ct. 2546, 2557, 115 L.Ed.2d 640 (1991):

> In habeas, if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition.

In this case, the California Supreme Court's order dealt with both the merits and the procedural posture of Siripongs' constitutional claims without identifying any particular procedural rule that completely barred any of them. The state's opposition to the petition raised a number of different bases for contending that the petitioner had waived each particular claim at issue, but the California Supreme Court did not indicate which, if any, it regarded as independent and adequate for dismissal. This is in contrast to *Coleman* itself, where the state had rested its argument solely upon a single procedural bar and the state court had obviously accepted its argument. *See Coleman*, 501 U.S. at 738–44, 111 S.Ct. at 2559–61. This case also is distinguishable from *Ylst v. Nunnemaker*, 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), in which the Supreme Court held that if there is a reasoned decision by a state intermediate appellate court clearly denying a petition on procedural grounds, a subsequent ambiguous order of affirmance by the state supreme court will not lift the bar. As in *Hunter v. Aispuro*, 982 F.2d 344, 347 (9th Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 240, 126 L.Ed.2d 194 (1993), there is no such reasoned decision in this case.

Basing a procedural default upon an ambiguous order that did not clearly rest on independent and adequate state grounds

would defeat one of the primary goals of the plain statement rule: providing the state courts a means of avoiding federal court intrusion into state jurisprudence while ensuring federal court review of constitutional questions. *See Long,* 463 U.S. at 1041, 103 S.Ct. at 3476. We need not decide whether the California Supreme Court's order in this case rested with sufficient clarity upon the grounds for procedural bar set forth in the state's opposition. The district court's reliance on those grounds was misplaced for another reason, and one independent of the foregoing analysis.

The California Supreme Court has recently held that the procedural bars the state relied upon are discretionary, and have not been applied consistently. *In re Clark,* 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993). We have recognized that such a state procedural rule cannot act as a bar to federal review. This is because the federal courts should not insist upon a petitioner, as a procedural prerequisite to obtaining federal relief, complying with a rule the state itself does not consistently enforce. *See Harmon v. Ryan,* 959 F.2d 1457, 1461–63 (9th Cir. 1992); *see also Johnson v. Mississippi,* 486 U.S. 578, 587, 108 S.Ct. 1981, 1987, 100 L.Ed.2d 575 (1988) ("a state procedural ground is not adequate unless the procedural rule is strictly or regularly followed.")

As the dissent notes, the California Supreme Court, in *Clark,* announced strict new standards for determining whether successive state habeas petitions should be allowed. *Clark,* 21 Cal.Rptr.2d at 515, 855 P.2d at 760. Nevertheless, although subsequent petitions in California had, prior to *Clark,* never been condoned by the California courts, they clearly were often permitted as a matter of discretion. *Id.* 21 Cal.Rptr.2d at 520, 855 P.2d at 740 ("on occasion, the merits of successive petitions have been considered regardless of whether the claim was raised on appeal or in a prior petition, and without consideration of whether the claim could and should have been presented in a prior petition."). Accordingly, while California procedural defaults for piecemeal claims after *Clark* may be non-discretionary, the strict standards announced in that opinion did not guide the California courts in 1991, when Siripongs' state petition was denied.

We therefore conclude that, even if we assume that the State Supreme Court did in fact rely upon the procedural defaults asserted in the state's opposition to the petition, it did not rest its decision on the type of independent and adequate state ground that precludes federal review. The state alternatively contends in this appeal that, on the merits, the petitioner has failed to establish a sufficiently colorable claim to warrant an evidentiary hearing. It is to this contention that we now turn.

In order to establish a colorable claim of denial of due process in connection with the biased interpreter, Siripongs must show that the bias was sufficient to render the trial fundamentally unfair. *Newton v. Superior Court of California,* 803 F.2d 1051, 1055 (9th Cir.1986), *cert. denied,* 481 U.S. 1070, 107 S.Ct. 2464, 95 L.Ed.2d 873 (1987); *see Gaskins v. McKellar,* 916 F.2d 941, 946–47 (4th Cir.1990), *cert. denied,* 500 U.S. 961, 111 S.Ct. 2277, 114 L.Ed.2d 728 (1991). Siripongs is not entitled to an evidentiary hearing merely because he suggests a basis for bias, he must raise at least an inference of prejudice. The difficulty with Siripongs' position is that, even assuming that the interpreter was biased and wished to influence the trial in a manner adverse to Siripongs' interests, Siripongs has not made out any colorable claim that the interpreter did influence the trial or even was in a position to do so.

Here, in contrast to the claims of ineffective assistance of counsel, we have no indication of what might have happened differently at trial had a completely neutral interpreter been utilized. The interpreter acted as an interpreter for only four of the 46 witnesses called at trial, and three of those witnesses testified principally in English. The fourth testified as to facts that were not in dispute. There are no affidavits from any of the witnesses stating that the translation in the record varies from their recollections of their actual testimony in Thai. In addition, Siripongs himself was fluent in Thai and had some proficiency in English. He was present during the testimony, and he has not identified any testimony that was prejudicially mistranslated.

Apart from translation of testimony, Siripongs places great emphasis upon the fact that the translator mistranslated appellant's prior felony record in Thailand to indicate that the offense was a violent robbery rather than a theft. However, in the absence of proof that violence was involved in the offense, the trial court treated the offense as a non-violent theft, and not a violent crime, thus effectively rejecting the translator's interpretation. Any alleged mistranslation by the interpreter of the defendant's criminal record was therefore immaterial to the proceeding.

There is also a contention that the translator communicated prejudicial information to the probation officer in completing the presentence report, but the nature of that information is not identified; the presentence report was circulated to trial counsel and is available to his habeas counsel as well. Moreover, the state trial court actually stated that it did not rely on the presentence report in imposing the death penalty.

Siripongs contends that other prejudicial material, in addition to the information provided by the interpreter, was contained in the presentence report. Because the trial court did not rely on the presentence report, this claim is rejected as well.

### CLAIMED PROSECUTORIAL INTIMIDATION OF WITNESSES AT PENALTY PHASE

■ Siripongs claims that the trial court should have held a hearing on Siripongs' contention that the prosecutor intimidated Peung and Noon, who were potential penalty phase witnesses, and that prosecutorial intimidation prevented them from testifying.

Trial counsel informed the trial court that he had evidence that the prosecutor had told the two witnesses that the prosecutor thought the witnesses knew more about the crime than they were telling. This conversation allegedly was overheard by the potential witnesses' stepfather. As an offer of proof, counsel offered to have the stepfather testify as to the nature of the conversation. Neither at trial nor in subsequent proceedings has Siripongs offered any additional information about the incident. The state court accepted the offer of proof but denied the motion for hearing because, on its face, a

prosecutor telling a witness that the prosecutor believes the witness knows more than he or she is saying is not a threat or intimidation, and also because counsel offered only the testimony of the stepfather and not the testimony of the witnesses themselves. The trial court's decision not to hold a hearing or call a mistrial does not entitle the petitioner to habeas relief. While the prosecutor's comments may have been improper, they did not render the trial fundamentally unfair so as to constitute a denial of due process. *See Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (a prosecutor's misconduct does not warrant habeas relief unless it renders the trial fundamentally unfair).

### INTERCEPTED PHONE CALL

Siripongs contends that the district court improperly granted summary judgment on his claim that the tape recording of his call from the jail to Peung was illegally obtained and should not have been admitted in the trial. The conversation was recorded by an officer standing nearby with a hidden recorder, not by use of a "tap" on the phone wire itself. Siripongs contends that the taping violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. §§ 2510–2521, as well as his constitutional rights to remain silent and to counsel.

■ Siripongs' constitutional contention is that the delay in providing him with telephone access and the surreptitious recording without *Miranda* warnings and after his request for counsel violated his Fifth and Sixth Amendment rights. Incriminating custodial statements are rendered inadmissible only if they are uttered in response to an act of coercion or interrogation, or the functional equivalent of interrogation. *Rhode Island v. Innis,* 446 U.S. 291, 300–02, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). The mere fact of custody is insufficient to make an incriminating statement inadmissible. Because there was no coercion or interrogation in this case, other than the fact of custody, there was no constitutional violation. *Arizona v. Mauro,* 481 U.S. 520, 528–30, 107 S.Ct. 1931, 1936–37, 95 L.Ed.2d 458 (1987)

(permitting a person in custody to enter a situation in which self-incrimination is "possible" with the hope that such self-incrimination will occur is not the functional equivalent of interrogation). The district court properly granted summary judgment on the constitutional claim.

■ Siripongs' statutory claim is that the taping of the phone call was an interception of a "wire" communication, which is unlawful if intercepted without consent or prior court authorization. 18 U.S.C. §§ 2510–21. If he is correct that the interception was of a wire communication, then he need not demonstrate that he entertained a reasonable expectation that his telephone call was private. *United States v. Hall,* 488 F.2d 193, 196 (9th Cir.1973). He need only show that the communication was intercepted without consent or without a warrant. *See* 18 U.S.C. §§ 2511(2)(a)(ii) & (3), 2515. A reasonable expectation that a communication is not subject to interception is required for protection under Title III if the interception is of an oral, as opposed to a wire, communication. *Id.;* 18 U.S.C. § 2510(2).

The district court correctly treated the communication as an oral communication. 18 U.S.C. § 2510(4) provides:

> "Intercept" means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device.

The police did not "intercept" a wire communication within the meaning of this statute because they acquired only what they recorded Siripongs saying into the mouthpiece, not what was transmitted over the wire. The reason there is no independent need to establish an expectation of privacy when "wire" communications are intercepted is because it is presumed that persons communicating by wire expect that what goes over the line will be private. *See Hall,* 488 F.2d at 196. But there is no reason for presuming an expectation of privacy for statements made in the middle of police stations. It is there that Siripongs' conversation actually was intercepted. This interception was of an oral not a wire communication.

This holding is consistent with the Seventh Circuit's decision that an individual who overhears one side of a telephone conversation by standing next to the speaker has not intercepted a wire communication merely because the person was speaking into a telephone at the time of interception. *United States v. McLeod,* 493 F.2d 1186, 1188 (7th Cir.1974); *see also United States v. Carroll,* 332 F.Supp. 1299, 1301 (D.D.C.1971). There is no contrary authority.

Because the interception was of an oral communication, its admissibility was not prohibited unless Siripongs had a reasonable expectation that his communication would not be overheard. *See* 18 U.S.C. § 2510(2). The facts surrounding this claim were developed at a pretrial suppression hearing and are entitled to a statutory presumption of correctness. *See* 28 U.S.C. § 2254(d). They are not materially in dispute. Siripongs placed the call while a police officer was standing three feet away. A television camera was suspended from the ceiling about eight feet from the telephone and pointed toward the phone. These facts compel the district court's conclusion that Siripongs could not reasonably expect any privacy during his conversation. *See In re John Doe Trader Number One,* 894 F.2d 240, 243 (7th Cir.1990); *United States v. Harrelson,* 754 F.2d 1153, 1169–70 (5th Cir.), *cert. denied,* 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241, *and cert. denied,* 474 U.S. 1034, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985).

Because Siripongs conducted his conversation in Thai, he argues he reasonably believed that Officer Shave would not be able to understand him and that this created a reasonable expectation of privacy. Siripongs, of course, could not know for certain whether Officer Shave understood the conversation. More importantly, the statute protects an oral communication only if there is an expectation that the communication will not be *intercepted,* i.e., "acquired." 18 U.S.C. § 2510(2) & (4). The statute does not protect conversations that clearly are subject to interception merely because the conversation might not be immediately understood. As the Fifth Circuit has noted in this context, "[m]istaking the degree of intrusion of which probable eavesdroppers are capable is not at all the same thing as believing there are no

eavesdroppers." *Harrelson,* 754 F.2d at 1170.

Finally, even if there were a doubt about the admissibility of the recording, the evidence was cumulative because Noon, who was the recipient of the call, testified as to what the defendant said. Accordingly, we cannot conclude that admission of the recording was prejudicial in any meaningful way.

### ADMISSION OF EVIDENCE FOUND IN SIRIPONGS' CAR

■ The state introduced incriminating blood stained items that were found in Siripongs' car. Siripongs contends that they were illegally seized because they were found only after he told the police where the car was when the police inquired for purposes of securing the car. The district court, after reviewing the record of the trial court suppression hearing, concluded that the questioning officer knew that his questions on the location of the car were likely to elicit an incriminating response and requested supplemental briefing on whether the evidence would inevitably have been discovered.

■ If the state shows that items seized as a result of interrogation would have been discovered inevitably, the evidence is admissible despite any constitutional violation. *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984). The supplemental declarations submitted to the district court, which are not disputed, remove any doubt concerning the inevitable discovery of Siripongs' car. The car was found at the mall where Siripongs was arrested, and he had the keys to the car in his pocket. Through information from the Department of Motor Vehicles, vehicle identification and owner identification were easily obtainable, and the officers would have sought this information. The police therefore inevitably would have discovered Siripongs' car and its contents.

### SEARCH OF SIRIPONGS' WALLET

■ Siripongs contends that his Fourth Amendment rights were violated when police searched his wallet and elicited an incriminating denial that he did not steal one credit card in the wallet, implying that he did steal other credit cards in his wallet and belonging to one of the murder victims.

■ Fourth Amendment claims are not cognizable in federal habeas proceedings if a petitioner has had full and fair opportunity to litigate them in state court. *Stone v. Powell,* 428 U.S. 465, 481–82, 96 S.Ct. 3037, 3046–47, 49 L.Ed.2d 1067 (1976). Siripongs had a full suppression hearing at trial, and does not contend otherwise. His contention that the state court on appeal did not understand his argument is misleading; Siripongs made his argument and it was rejected. Moreover, Siripongs' argument goes not to the fullness and fairness of his opportunity to litigate the claim, but to the correctness of the state court resolution, an issue which *Stone v. Powell* makes irrelevant. *Gordon v. Duran,* 895 F.2d 610, 613–14 (9th Cir.1990).

### JUROR MISCONDUCT

■ Before the penalty phase, trial counsel alerted the court to an incident of potential juror misconduct. Following the allegation, the court conducted a brief examination of one of the jurors outside the presence of the defendant. Siripongs contends that the hearing was inadequate because he was not present.

■ The absence of a defendant at a hearing violates due process only to the extent that a fair and just hearing cannot be held without the defendant present. *United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985) (per curiam). Here, at the request of trial counsel, the trial court conducted an in camera proceeding with one of the jurors to determine whether any misconduct had occurred. At the hearing, without the prosecutor or defense counsel present, the juror stated that she had asked her mother whether, when the defense counsel's table was cleared off, it meant that the defense was resting. According to the juror, her mother then asked her attorney what this meant, and the attorney told her that it probably meant that the defense was resting. The trial court, after questioning the juror, determined that the communication did not harm Siripongs' case. Siripongs has not demonstrated how this hearing was unfair or that his presence at

the hearing would conceivably have changed the result. Accordingly, the district court properly rejected this claim.

### APPLICATION OF THE WITHER-SPOON/WITT STANDARD IN VOIR DIRE

■ Siripongs next contends that the trial court applied the wrong standard on voir dire to weed out "death prone" jurors. Siripongs alleges this was error under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), which hold that a juror should be excluded for cause if the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 424, 105 S.Ct. at 852.

We assume, arguendo, that the trial court did employ the incorrect standard in determining which venire members would be stricken for cause. The appropriate inquiry under *Witherspoon* and *Witt* is whether the jury that is actually empaneled is impartial. *Ross v. Oklahoma*, 487 U.S. 81, 86, 108 S.Ct. 2273, 2277, 101 L.Ed.2d 80 (1988). Siripongs has failed to demonstrate that any of the jurors actually empaneled were unduly prone to impose the penalty of death. It is immaterial that Siripongs may have been required to use preemptory challenges to excuse jurors that the trial court would have excused for cause had it employed the proper standard. Siripongs did not exhaust all of his preemptory challenges. Moreover, the loss of preemptory challenges is not a due process violation. *Ross*, 487 U.S. at 88, 108 S.Ct. at 2278; *see J.E.B. v. Alabama*, —— U.S. ——, —— n. 7, 114 S.Ct. 1419, 1426 n. 7, 128 L.Ed.2d 89 (1994).

### ERRONEOUS INSTRUCTIONS AT THE PENALTY PHASE

■ Siripongs raises a series of challenges to the death penalty jury instructions, some of which are joined in by amicus California Appellate Project. Under applicable California law, the jury was to arrive at its penalty verdict by weighing aggravating and mitigating circumstances, and it was so instructed. *See* Cal.Penal Code § 190.3. Two of the factors enumerated in the statute, and which the jury was instructed to consider were: "(a) the circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true;" and "(b) the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

Siripongs contends that the jury was not instructed that in California, the circumstances of the underlying offense could be considered as only one aggravating circumstance, and that it was not told that it could find Siripongs' lack of a violent criminal record to be a mitigating factor. He claims the latter error was compounded by the prosecutor's ambiguous reference in closing argument that the jury could consider "past violent conduct," when the prosecution did not identify the conduct.

The jury was instructed in language that mirrored the statute. Siripongs' counsel offered no additional clarifying instructions, nor did he object to any comments by the prosecutor concerning the past criminal record.

The instruction to the jury that it "shall impose death" upon a finding that aggravating circumstances outweighed mitigating circumstances was upheld by the Supreme Court against an Eighth Amendment challenge in *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). Siripongs, accompanied by California Appellate Project, makes a slightly different argument with respect to the "shall impose" instruction, pointing out that the California Supreme Court has consistently interpreted its Code to require imposition of the death penalty only if "death is the appropriate penalty under all the circumstances." *People v. Duncan*, 53 Cal.3d 955, 281 Cal.Rptr. 273, 810 P.2d 131, 143–44 (1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1269, 117 L.Ed.2d 497 (1992); *People v. Brown*, 40 Cal.3d 512, 230 Cal.Rptr. 834, 843, 726 P.2d 516, 532 (1985), *rev'd on other grounds*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987).

We assume, arguendo, that Siripongs may have had a liberty interest in having the

California courts apply its statutorily mandated procedures to him in the same manner as other defendants. *See Fetterly v. Paskett,* 997 F.2d 1295, 1299–1301 (9th Cir.1993). The instructions as a whole, however, in this case did not mandate an improperly mechanical weighing process, or prevent the jury's exercise of discretion as Siripongs contends. The trial court tempered its "shall impose death" instruction by other instructions. For example, the jury was told it could take into account any mitigating factors, and that "any one [mitigating factor] may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case."

Some aspects of Siripongs' arguments in this regard, however, may be relevant to the district court's consideration of his claim of ineffective assistance of counsel at the penalty phase. Of particular relevance may be counsel's failure to request an instruction that the defendant had no prior violent criminal record. That failing now appears to have been related to counsel's apparently mistaken refusal to call any character witnesses for fear of impeachment by a prior conviction. We are unable to conclude that any imperfections in the instructions themselves, however, independently or taken together, constituted plain constitutional error requiring us to order the district court to vacate the penalty phase determination.

### CONCLUSION

The judgment of the district court dismissing the petition for habeas corpus is VACATED and the CASE REMANDED FOR EVIDENTIARY HEARING on appellant's claims of ineffective assistance of counsel at the guilt and penalty phases of his trial. The ruling of the district court granting summary judgment for the state on Siripongs' remaining claims is AFFIRMED.

FERNANDEZ, Circuit Judge, concurring and dissenting:

I dissent from the majority opinion on the issues discussed in this opinion. As to its other determinations, I concur.

A. *Ineffective Assistance of Counsel.*

I do not agree that an evidentiary hearing regarding ineffective assistance of counsel is required in this case. As I see it, Siripongs wants to have the district court and us engage in the kind of hindsight that the Supreme Court has warned against. *See Strickland v. Washington,* 466 U.S. 668, 689–90, 104 S.Ct. 2052, 2065–66, 80 L.Ed.2d 674 (1984).

Counsel viewed the state's case as a chain of circumstantial evidence. His strategy was to break the chain by showing that there was a reasonable doubt as to several of the links. That was for the purpose of showing that Siripongs was not even at the scene of the killing; that he, a non-violent, prayerful monk, was not a part of the robbery itself. The evidence developed at trial lent some support to that theory. That certainly appears to be reasonable under the circumstances and does not demonstrate ineffective assistance. But, says Siripongs, there was another strategy that was so superior that it should have been used. I do not agree.

The evidence against Siripongs was powerful; it resulted in a unanimous affirmance of his conviction and sentence by the California Supreme Court. *People v. Siripongs,* 45 Cal.3d 548, 247 Cal.Rptr. 729, 754 P.2d 1306 (1988), *cert. denied,* 488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 810 (1989). Still, he now claims that despite the fact that his hands were cut, that clothing was found which was covered with blood which may have been his and that of a victim, that he had the stolen jewelry, that he had the victim's credit cards, and that he was trying to hide evidence, there might have been an accomplice, who really committed the murder. He says that counsel should have vigorously pursued that possibility. Of course, he never sought to identify the other supposed culprit (or, by some accounts, culprits)—he still has not identified him. In the face of all of this, and based on a marvelous display of second guessing by "experts," Siripongs says that there should have been an attempt to push off the actual violent killing on a phantom accomplice. That accomplice would have been the person who did the dirty work while Siripongs, after fighting his violent friend in a vain attempt to save the victims, got to keep the loot. The accomplice defense would have been based upon essentially the same

evidence that was developed at trial but would have placed Siripongs at the scene of the killing.

We are also told that there is nothing strange about that story, and that all would come clear if the jury had been told that Siripongs, an admitted participant in a robbery-killing, was simply following Thai culture and religion in not naming his phantom accomplice, who, we must remember, is the supposed killer of the victims. In other words, counsel, without help from his client, was supposed to have admitted that Siripongs was at the scene, created a phantom unnamed accomplice, dubbed that accomplice the actual killer, presented Siripongs as an attempted savior of the victims, explained the keeping of the loot and other evidence of the crime, and pointed to the fact that Siripongs was an honorable person bound by his culture and religion to remain silent and stoic. Thus, it is said, Siripongs might have saved his own life. We are also told that when counsel failed to present that story, rather than the one he did, he was constitutionally ineffective. The district court was not impressed by that improbable scenario or by the conclusion which is said to follow from it. Neither am I. Certainly this hindsight defense does not so outstrip counsel's strategy as to permit a finding of ineffectiveness.

Siripongs' subsidiary claim that counsel did not understand the nature and possible use of his prior burglary conviction in Thailand is, to my mind, a misstatement of the trial court record. It is perfectly clear that counsel himself convinced the state trial court that the Thai conviction was not a crime of violence. Still, counsel did not want to call family members to attempt to "humanize" Siripongs because counsel wanted no possibility of having the jury discover that there had been a prior conviction of that type. As the district court pointed out, even now the so-called humanizing evidence is "utterly unmoving." It seems to me that counsel could properly and competently decide that it was well worth excluding that evidence in order to assure the exclusion of references to the prior crime. No evidentiary hearing is needed to demonstrate that.

Finally, Siripongs points to the fact that this was counsel's first capital case. I fail to see the significance of that, unless we are now supposed to infer that attorneys are incompetent when they try their first capital case, even though they may be otherwise experienced in the law. As it was, Siripongs' counsel had been a public defender for nine years and had extensive trial experience. He had handled robbery, rape and homicide trials, among others, and was certified as a criminal law specialist. To be precise, he had also taken a murder case to trial, but it had been resolved before the trial was completed.

Thus, the district court was not required to conduct an evidentiary hearing to explore the issues that Siripongs claims show that his attorney was incompetent.[1]

B. *Interpreter Bias.*

I also disagree with Siripongs' contention that there could have been no such thing as a procedural default in California because the default rules were not regularly followed. For that proposition Siripongs relies upon *In re Clark*, 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993), a case where, ironically enough, the California Supreme Court attempted to clear up any doubt about the force of its procedural default rules. The court did so because, as sometimes happens in law, uncertainties and misunderstandings had arisen.

In *Clark*, after first saying that its practice had been to reject piecemeal habeas corpus petitions, the court did say that procedural bars to second petitions had been "termed" discretionary and that prior cases had "suggested" that the court "may be willing to entertain multiple collateral attacks." *Id.* at 768, 21 Cal.Rptr.2d at 520, 855 P.2d at 740. However, the court stated that it had "never condoned abusive writ practice or repetitious collateral attacks on a final judgment." *Id.* at 769, 21 Cal.Rptr.2d at 521, 855 P.2d at 741. Rather, it had placed restrictions upon repetitive attacks and had condemned them. *Id.* at 774, 21 Cal.Rptr.2d at 525, 855 P.2d at 745. The court did say that there are certain

---

**1.** Also, I do not believe that the alleged instructional error demonstrates counsel's incompetence.

exceptions. It said that it would "not be inflexible" but that absent justification a summary denial of successive petitions would follow if there were not allegations of "facts which, if proven, would establish that a *fundamental* miscarriage of justice occurred...." *Id.* at 797, 21 Cal.Rptr.2d at 540, 855 P.2d at 760. It then went on to define the standard that a petitioner must meet in order to show a fundamental miscarriage. *Id.* at 797–98, 21 Cal.Rptr.2d at 540–41, 855 P.2d at 760–61. In fine, *Clark* certainly does not justify our erasing the effect of California procedural default determinations for all cases prior to *Clark.* I fear we will live to rue the day that we did so.

Beyond that, it appears to me that California did, indeed, dispose of the interpreter bias claim on the alternative procedural default ground when it denied the petition *both* for reasons of procedural default *and* on the merits. I also think that we should respect that decision. *See Carriger v. Lewis,* 971 F.2d 329, 333 (9th Cir.1992) (en banc) (state court may alternatively deny relief on merits of federal constitutional claim even after dismissing claim on procedural grounds), *cert. denied,* —— U.S. ——, 113 S.Ct. 1600, 123 L.Ed.2d 163 (1993); *Thomas v. Lewis,* 945 F.2d 1119, 1123 (9th Cir.1991) (claim was defaulted when state court found that petitioner had waived all the issues even though state court also discussed merits of claims); *cf. Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 1044 n. 10, 103 L.Ed.2d 308 (1989) ("Moreover, a state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."); *Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983) ("If the state court decision indicates clearly and expressly that it is *alternatively* based on bona fide separate, adequate, and independent grounds, we, of course, will not undertake to review the decision.") (emphasis added).

I would uphold Siripongs' conviction in all respects. I would affirm the judgment of the district court. Thus, I concur for the most part, but dissent in part.