Jaturun SIRIPONGS, Petitioner–
Appellant,

v.

Arthur CALDERON, Warden, in his
capacity as Warden of San Quentin
State Prison, Respondent–Appellee.

Jaturun Siripongs, Petitioner,

v.

Arthur Calderon, Warden, Respondent.

Nos. 97–99003, 99–70116.

United States Court of Appeals,
Ninth Circuit.

Argued Telephonically Feb. 7, 1999.

Decided Feb. 8, 1999.

Michael Laurence and Gary D. Sowards, Sternberg, Sowards & Laurence, San Francisco, California, for the petitioner-appellant.

Laura Whitcomb Halgren, Deputy Attorney General, San Diego, California, for the respondent-appellee.

Before: MARY M. SCHROEDER, HARRY PREGERSON, and FERDINAND F. FERNANDEZ, Circuit Judges.

SCHROEDER, Circuit Judge:

We must consider a motion for stay of execution and application for leave to file a successive petition for writ of habeas corpus under 28 U.S.C. § 2244(b)(3)(A). We also consider a petition to recall the mandate.

This is the fourth time this capital case has been before this panel. Petitioner Jaturun Siripongs was convicted and sentenced to death in 1983 for the brutal murders of the owner and an employee of a Thai market in Orange County. On his first habeas petition, we remanded to the district court for an evidentiary hearing on his claims of ineffective assistance of counsel in the guilt and penalty phases of his trial. *See Siripongs v. Calderon,* 35 F.3d 1308 (9th Cir.1994) (*Siripongs I* ). We were concerned that his trial lawyer had failed to put on a defense that the crimes were actually committed by an accomplice whom Siripongs refused to identify because of his Thai cultural values. *See id.* at 1315–16.

The evidentiary hearing revealed that Siripongs was an accomplished informant who held no cultural beliefs that would interfere with his disclosing the name of his accomplice. *See Siripongs v. Calderon,* 133 F.3d 732, 735 (9th Cir.1998) (*Siripongs II* ). We affirmed the district court's denial of relief because we held that trial counsel's rejection of an accomplice defense was a strategic and sensible judgment; without identification of the accomplice, there was insufficient likelihood of the jury's accepting such a defense to justify admitting that Siripongs was present at the crime scene. *See id.* We also noted that counsel had hired an independent expert to conduct mock trial cross-examination to test Siripongs' credibility and found it wanting.

Siripongs' execution was originally scheduled to take place November 17, 1998, but the district court ordered it stayed on the basis of Siripongs' due process challenge to his clemency hearing. This court denied the state's mandamus application. *See Wilson v. United States Dist. Court,* 161 F.3d 1185 (9th Cir.1998). Siripongs received a new clemency hearing and clemency was denied February 6, 1999. His execution is scheduled for 12:01 a.m. February 9, 1999.

Siripongs presents two claims. The first is that the prosecution suppressed actual knowledge that a friend of Siripongs, a young woman nicknamed "Noon," was his accomplice and the true perpetrator. Consequently, he contends that when Noon testified as a witness for the prosecution that she was not present at the market, the prosecution knew the testimony was false. The second is that the prosecution suppressed and mischaracterized material exculpatory evidence of an accomplice who was the actual killer.

In order to prevail in his application to file a second petition, Siripongs must make a prima facie showing that (1) the facts underlying his claim could not have been previously discovered through the exercise of due diligence; and (2) those facts, if proven and viewed in the light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty and sentenced him to death. 28 U.S.C. § 2244(b)(2)(B)(i)-(ii).

## APPLICATION TO FILE A SUCCESSIVE HABEAS PETITION

### CLAIM 1

■ Siripongs asserts in Claim 1 that in the Fall of 1998, shortly before his scheduled execution, the prosecution admitted that it knew that there was an accomplice, that it was Noon, and that she committed the murders.

The only supporting documentation for these assertions are two newspaper articles that quote the trial prosecutor and a current deputy D.A., who did not try the case. The trial prosecutor said that he believed the evidence showed a second person was involved. The current deputy D.A. said that Siripongs had a female companion nicknamed "Noon" and that she may have been present. He also said that an investigator believed that she was more of a "wheel person" (apparently meaning that she was only assisting as a driver or in some similar capacity), but the prosecution could never prove it.

The newspaper articles do not state that the prosecutors knew that there was an accomplice, or that they knew it was Noon. Neither the articles nor any evidence in the record suggests that the prosecution suspected that Noon committed the stabbing and strangulation murders alone and fended off Siripongs' efforts to stop the stabbing murder; yet, that is the implausible theory advanced in these applications. The articles do not suggest that there was any exculpatory evidence hidden from the defense.

In fact, there is nothing in the prosecutors' statements that reveals anything not already known at trial by both sides. Our first opinion summarizes evidence linking Noon to the scene, including the presence of a letter addressed to her found under one of the bodies and her jacket found in a dumpster along with Siripongs' blood-stained clothing. *See Siripongs I*, 35 F.3d at 1311. In addition, we noted that there were inconsistencies between Noon's statements and the statements of other witnesses. *See id.* at 1313.

The overwhelming evidence of Siripongs' involvement included the fact that blood consistent with his was found all over the crime scene and on much of the evidence in the dumpster. The dumpster evidence also included items from the market. Siripongs tried to sell jewelry stolen from one of the victims and used the credit card of that victim's husband.

■ The only information asserted in Claim 1 that arguably was not previously known to the defense is the existence of prosecutorial theories and suspicions, rather than knowledge of facts or evidence. Prosecutors are under no obligation to disclose their theories, thought processes, or even all investigatory work. *See United States v. Agurs*, 427 U.S. 97, 109, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

Claim 1 advances no new material facts or colorable claims of constitutional error.

### CLAIM 2

■ Claim 2 rests primarily on the assertion that the state suppressed physical evidence of blood, hair, and shoeprints found at the crime scene that tended to show that an accomplice committed the murders. In support of this assertion, Siripongs has produced the declarations of recently hired experts who examined the state's laboratory reports, their underlying documentation, and photographs, most of which were provided Siripongs' counsel at trial. None of the evidence was suppressed.

Siripongs also contends that the prosecutor mischaracterized the underlying evidence at trial and misled defense counsel and jury into believing there was no evidence of an accomplice. Siripongs particularly contests the prosecutor's argument at trial, supported by the crime lab's report of conclusions, that there was no blood at the scene inconsistent with the blood of Siripongs or the male victim, Quach. Siripongs' present expert points to the serologist's underlying worksheet showing the blood typing results from the various stains found at the scene. That chart, according to the new expert, shows that one stain was consistent with neither Siripongs' nor Quach's blood. It also shows that the stain on the door knob that the lab reported to be "inconclusive" was, in fact, a mixture of the blood of two persons.

It is difficult to see how the prosecutor's accurate description of the lab's conclusions

can be regarded as deceptive or misleading, particularly because Siripongs' counsel had both the conclusions and the worksheets before trial. His defense counsel had employed an expert to review them who failed to detect any inconsistencies. Moreover, even if the inconsistencies had been known to the jury, they would not have had any material effect on the jury deliberations, because the overwhelming majority of blood stains were consistent with Siripongs' blood. The isolated stain on which Siripongs relies did not match other stains found at the scene or on any other evidence, and there is still nothing linking that stain to Noon.

In an effort to link Noon to the scene, Siripongs points once again to the presence of the letter to Noon found under a victim's body and Noon's jacket in the dumpster. This evidence was all before the jury.

■ Siripongs offers the affidavit of Dr. Zajac, who reviewed, among other things, the evidence concerning the hair samples. The expert opines that the crime lab's examination of the hair was insufficient. This is not evidence of prosecutorial misconduct. Moreover, the evidence was available for the defense to test at trial. There was no suppression of evidence here, as there was in *Thomas v. Goldsmith*, 979 F.2d 746, 749 (9th Cir.1992), upon which Siripongs relies.

■ Siripongs also points to the computerized examination of a photograph of the scene that, through new technology, shows an unidentified bloody shoeprint beneath a previously identified shoeprint. This is not evidence that the state suppressed. Nor is the existence of unidentified footprints at the scene a new fact. *See Siripongs I*, 35 F.3d at 1313.

■ Also lacking any material significance is the affidavit of a newly retained expert who examined the photographs of the knife wounds on Siripongs' hands and concluded that they were more likely defensive than offensive wounds. The prosecution's own witnesses testified that these wounds "could have been defensive cuts if Siripongs actually attempted to prevent the killings." *Id.*

Siripongs has failed to meet either of the requirements for the filing of a successive petition. The facts underlying Siripongs' claim could have been discovered through the exercise of due diligence. Furthermore, even if proven, these facts do not amount to clear and convincing evidence that, but for the claimed error, no reasonable factfinder would have found Siripongs guilty and sentenced him to death.

Siripongs' claims that any conduct of the government impeded his ability to mount an accomplice defense ring particularly hollow against the undisputable fact that the state could not possibly have known more about the identity of an accomplice than Siripongs knew himself.

## PETITION TO RECALL THE MANDATE

Finally, Siripongs asks us to recall the mandate in his first petition. He claims that the conduct of the state described in Claims 1 and 2 amount to fraud justifying a recall, despite the strictures of AEDPA. *See Calderon v. Thompson*, 523 U.S. 538, 118 S.Ct. 1489, 1500, 140 L.Ed.2d 728 (1998). No fraud has been demonstrated.

All motions and applications are denied.

PREGERSON, Circuit Judge, dissenting:

Petitioner raises serious and substantial issues that bear on an "accomplice defense." These issues implicate the fundamental fairness and validity of the trial, particularly its penalty phase, and should be resolved at an evidentiary hearing before we determine whether to recall our earlier mandate or grant a second habeas petition. In the meantime, a stay of execution is warranted.